UNITED STATES v. WELLS et al.

(District Court, D. Idaho, C. D. March 12, 1908.)

No. 448.

1. COURTS—FEDERAL COURTS—CONFORMITY TO STATE PRACTICE.

In the absence of congressional legislation, the laws of the state where-in a court of the United States is held control the practice before federal grand juries; but failure of a state statute to point out a method for attacking the validity of an indictment cannot deprive a defendant of that right.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 908.]

2. CRIMINAL LAW—PLEADING—PLEA IN ABATEMENT—COUNTER AFFIDAVITS.

Matters not disclosed by the record are properly presented by plea in abatement; but, if the rule were otherwise, the filing of counter affidavits disputing matters set up in affidavits accompanying a plea in abatement is a waiver of the objection that the issue was raised by plea, rather than by motion to quash.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 638-642.]

3. INDICTMENT AND INFORMATION—NECESSITY.

Offenses under section 5440, Rev. St. (U. S. Comp. St. 1901, p. 3676), are infamous, and can only be tried upon indictment returned by a grand jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, §§ 10, 12.]

4. SAME—CONSTITUTIONAL LAW.

While the fifth amendment of the Constitution enables the people, through the grand jury system, to initiate criminal prosecutions, it was primarily adopted and still stands as a safeguard against arbitrary or oppressive action.

5. GRAND JURY—DELIBERATIONS—DUTIES OF DISTRICT ATTORNEY.

The district attorney has no right to participate in nor be present during the deliberations of a grand jury, nor to express opinions on questions of fact, or as to the weight and sufficiency of the evidence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Grand Jury, § 73.]

6. SAME—MISCONDUCT OF DISTRICT ATTORNEY.

The district attorney, at the conclusion of the evidence, without invitation from the grand jury, or request for information or advice, made an extended address, in which he commented upon and reviewed the evidence and explained and applied the law thereto for the purpose of securing an indictment. The remarks amounted to an expression of opinion that the defendants were guilty and that the grand jury should return an indictment against them. At the conclusion of the address, without deliberation other than that had during its delivery, and without discussion among themselves, the grand jury proceeded to ballot on the persons under investigation, a list of whom the district attorney furnished during the course of his remarks. *Held*, that while the mere presence of a prosecutor during the taking of a vote or during the deliberations,

through inadvertence and without intending to influence any action which may be taken, is not necessarily fatal to a bill returned under such circumstances, yet where the prosecutor not only expresses his opinion, but urges the finding of an indictment, and it is clearly shown that the grand jury must necessarily have been influenced, whether consciously or unconsciously, and particularly where it is manifest that at least one defendant was indicted without substantial evidence, prejudice will be presumed, and an indictment so returned will be quashed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Grand Jury, § 73.]

7. INDICTMENT AND INFORMATION—MOTION TO QUASH—GROUNDS.

The fact that it sufficiently appears from testimony adduced in open court on the trial of one of the defendants, upon the indictment so returned, that there was probably sufficient proof before the grand jury to justify the finding of a true bill as to some of the defendants who were indicted, does not deprive them of the right to a fair and unprejudiced investigation before the tribunal created by the Constitution, free from outside interference and undue influence. To hold, because the evidence was sufficient as to certain defendants that the indictment ought not to be quashed as to them, would be to substitute the judgment of the court for that of the grand jury.

(Syllabus by the Court.)

M. C. Burch and S. R. Rush, Sp. Asst. Attys. Gen., and N. M. Ruick, U. S. Atty.

Hawley, Puckett & Hawley and Frank Martin, for defendants.

WHITSON, District Judge. There are several cases against a part of the defendants, indicted under section 5440, Rev. St. (U. S. Comp. St. 1901, p. 3676) but we are only now concerned with No. 448, the indictment having been returned by the grand jury on April 12, 1907. The defendants John I. Wells and Patrick Downs filed motions to quash, which were overruled in September for reasons then assigned. They also presented two pleas in abatement. The first related to the statute of limitations. It was agreed by counsel in open court that this question was properly raised by demurrer theretofore interposed. Plea No. 1 was thereupon overruled. The second plea in abatement charges misconduct of the district attorney, whereby the defendants were denied a fair and impartial investigation of the charge against them. The averments of this plea may be summarized as follows:

At the conclusion of the testimony taken before the grand jury, while deliberating and before a vote had been taken, and prior to any discussion among themselves, or at all, concerning the sufficiency of the evidence produced to warrant the finding of an indictment, the district attorney went before that body, without request, and without being informed that any advice from him was desired, and proceeded then and there in argument to deduce his conclusions from the proofs, and to give his opinion thereon, and to urge the finding of an indictment; that the argument was at least an hour in length; that he said there need be no hesitation in finding the indictment, as the jury would soon be adjourned, scattered and gone; that no one would blame them, but the responsibility would rest upon him and other parties, who would be accountable; that he continued his argument until about time for adjournment, whereupon he stated that he wish-

ed the indictment voted at once; that he further stated, then and at numerous other times during the sessions of the grand jury, that in asking for an indictment against these defendants and others he was acting under specific instructions from the Department of Justice at Washington; that there was plenty of evidence upon which to find the indictment, and that he had other evidence which he had not adduced, but would do so at the trial, which would be quite sufficient to justify their action; that there was never any discussion by the grand jury as to the advisabilty of voting the indictment, but all deliberation was cut off and prevented, and, although jurors requested permission to make statements, they were not permitted to do so, the discussion being limited to that of the district attorney; that when the grand jury convened the following morning the district attorney immediately entered the grand jury room without invitation, whereupon he was requested by a member to leave the room, the grand juror at the time stating that they had some matters which they desired to discuss in his absence; that he postively refused to absent himself, saying that he would not leave, and that no further consideration could be had until the indictment was signed; that he thereupon directed the foreman to sign the indictment, without permitting further consideration or discussion, and without it being read, the members not being permitted to know the contents or the parties indicted; that the indictment was actually signed and returned without the knowledge of any member, except possibly the foreman, as to the contents or the persons indicted; that a number of papers, contracts, and agreements were withheld from the grand jury, which was compelled to take the contents from the district attorney's statements; that at no time after the evidence was taken were the deliberations of the grand jury permitted to go on freely or under its own direction or control, nor was it permitted to deliberate or consider the evidence as desired, but was urged and directed to proceed without discussion or deliberation; that the members of the grand jury permitted themselves to be thus influenced by the appeals and arguments of a zealous advocate, instead of relying upon a calm and fair deliberation on the evidence.

The third pleas in abatement were interposed by the defendants Martin and Pritchard only. These defendants separately complain that in obedience to subpœnas duly issued and served they appeared before the grand jury and gave evidence material to their own connection with transactions under investigation, without being informed or having knowledge of that fact, by which they were greatly prejudiced in being thus compelled to testify against themselves. Exceptions to the second and third pleas were overruled, and a hearing ordered upon them. Accordingly witnesses were called to ascertain the truth or falsity of the matters therein charged.

First, then, considering plea No. 2, it is to be observed that the grand jury was composed of 23 persons. Jurors Latham and Sloan made affidavits for the defendants. These affidavits are attached to the plea of the defendant Martin. Eastman, Clopton, King, Trout, Nicholson, Newman, Brannon, Gess, Grigsby, McGlinchey, Hartman, Adelmann, Bayles, Windell, Wilson, and Hashbarger made affidavits for the prosecution. Latham, Sloan, and Cunningham were called as

witnesses to sustain the allegations of plea No. 2, and orally gave their testimony in court. The prosecution then by agreement submitted affidavits of the jurors above referred to as having been made on behalf of the prosecution, such affidavits to stand as their examination in chief, subject to cross-examination, and all of such jurors were thereupon called and cross-examined, with the exception of Windell, and, in addition to those who made affidavits, Ashbe and Halstead were examined, making a total of 21 jurors who testified. Nothing short of an extended and critical examination of the testimony will reveal exactly what occurred before the grand jury. That the district attorney did make an address was testified to by every witness who was called, with the exception of Juror Gess, who had no distinct remembrance. Indeed, it is not denied. As to the time consumed the jurors vary in their estimates, as will appear by reference to the margin.[1] That this address was voluntarily made and without request for advice is not controverted. What was said extracts from the testimony will best disclose.[2] That the district attorney repeatedly said that he was making the investigation under instructions

[1] Talked an hour. (Latham, pp. 2, 3.) From an hour to three quarters of an hour. (Sloan, p. 52.) Did not remember. (Cunningham, p. 74.) Not to exceed 20 minutes. (Halstead, p. 81.) Half an hour. (Wilson, p. 85.) Not over half an hour. (Ashbe, pp. 93, 94.) Quarter of an hour to 20 minutes. (Adelmann, p. 108.) An extended address. (Newman, p. 116.) Nearly half an hour. (Hartman, p. 122.) On cross-examination this juror was not certain. (Page 124.) No remembrance. (Gess, p. 131.) Fifteen to 20 minutes. (McGlinchey, p. 134.) Between half an hour and an hour. (Bayles, p. 140.) Twenty to 30 minutes. (Nicholson, p. 147.) Ten minutes. (Eastman, p. 154.) Half or three-quarters of an hour. (Clopton, p. 160.) Half an hour or less. (King, p. 164.) About twenty minutes. (Trout, p. 167.) Between 20 and 30 minutes. (Grigsby, p. 173.) Explained law and briefly went over the testimony. (Hashbarger, affidavit.) Twenty minutes or half an hour. (Brannon, affidavit.) Did not state. (Windell, affidavit.)

[2] "A. Well, I took from his talk that he wanted indictments brought on those parties, the list of names he brought up. He stated merely he thought the testimony would justify it, or words to that effect. Q. Justify the finding of the bill? A. Yes, sir." (Latham, p. 3.) "A. Well, as I understood it at that time, he was reviewing the evidence that had been submitted to the grand jury, just the same as any other attorney would to a jury. Q. That is, the same as they would in the trial of a case? A. I didn't see very much difference in it. He talked along that subject, it seems to me." (Sloan, p. 52.) "The district attorney brought a list of the names into the grand jury room, and in referring to them said: 'They had plenty of evidence to convict them.'" (Sloan, p. 53.) "The district attorney suggested that they take immediate action." (Sloan, pp. 54, 63.) Cunningham would not call it an argument. Said he made some statements in a general way. (Page 74.) Halstead, in answer to the question as to whether the district attorney referred to the evidence in his address, said: "Why, I think he did; for that was generally his subject. I think it was in regard to the evidence, or in regard to these indictments." (Page 81.) Ashbe, after much evasion and apparently with great reluctance, admitted that he explained the law and the facts and went over the testimony. "Well, the law, as I remember, and he went over the testimony briefly. He mentioned the different phases of it bearing on the case." (Page 104.) "Was explaining the law or duties of grand jurors." (Adelmann, pp. 102–109.) "Q. He made quite an extended argument, did he not? A. Well, I don't hardly know whether it would be called an argument or not. Q. Well, an

from the Department at Washington, like the making of the address, is in effect admitted. Cross-examination of the witnesses, conducted by him, proceeded upon that assumption.

Quotations have been made from the evidence given by the witnesses in open court, where there was opportunity for full disclosure. Little weight can be given the ex parte affidavits of grand jurors which have been filed, either to overturn or sustain the indictment.

address, or whatever it would be called? A. Yes. Q. And in that he reviewed the evidence that had been given by the different witnesses? A. Well, he kind of summed up. Q. He summed up the evidence? A. Whether he reviewed the examinations, or anything else, I don't remember. Q. He called your attention to a statement of the various witnesses. A. I would call it rather a summing up of evidence. Q. A statement of all that had been said. A. In other words. Q. And in connection with that he told you what the law of the case was, did he? A. Well, I think it was in regard to some of the evidence, and points of law proper to the case." (Newman, p. 116.) "A. He made some kind of an address; yes, sir. Q. Well, is your recollection at all clear in regard to that matter? A. As to just what was said? Q. Yes, sir. A. No; it is not right clear as to just what was said. If you will ask me questions, perhaps it will come to my mind." Did not remember that he referred to the evidence; memory not good; finally concluded could not tell what was said. (Hartman, pp. 122–124.) Gess remembered nothing about the address, nor much of anything else. (Page 128.) "He stated the law of conspiracy." (McGlinchey, p. 135.) "Q. In the course of that address he spoke of the law of conspiracy, did he not? A. Yes, sir. Q. And he spoke of the evidence that had been given by the different witnesses, did he not? A. Yes, sir. Q. About calling attention to the main points in the evidence? A. Yes, sir. Q. And he told the grand jury what their duty was, did he not? A. Yes; I think he did. Q. Did he discuss this evidence pretty thoroughly; call your attention to it in an extended way? A. Well, he went over some of the evidence, I suppose. Q. He went over the main points in the evidence that had been given? A. Yes, sir." (Bayles, p. 140.) "Q. He told you what the different witnesses testified to, the important matters that had been brought out by the evidence of the different witnesses, and called your attention to it, did he not? A. Yes, sir. Q. And after that on any occasion did he call your attention to the law governing the matter, in connection with that? A. No; not until he got through. He explained the law to us, what constituted conspiracy. Q. After he had explained the evidence to you, and what the witnesses testified to, then he explained the law to you? (Objection. Overruled.) Q. Is that correct? A. I think so. Q. He explained the evidence, went over the evidence, taking and showing you the strong points of the evidence, did he not, then explained the law, and then told you he would leave it to you? Is that the way of it? A. Yes, sir." (Bayles, pp. 141, 142.) "A. My recollection, Mr. Hawley, is that after Mr. Ruick examined the last witness he rose to speak before the grand jury, and he said—I can't recollect his language—he says: 'This will be the last witness we will examine, and the matter is up to you, gentlemen.' Then he went on to give us an outline of what constituted conspiracy, and our duties as grand jurymen, in a general way I can't remember it accurately. I don't pretend to say what he did say." (Nicholson, p. 148.) "A. He explained the question about conspiracy, stated what conspiracy was, and went on in a general way over some of the main points of evidence, showing that there was a conspiracy. Q. And he stated the points that had been made in the evidence? A. He rehearsed some of the main points that came up before us. Q. Called your attention to the salient points? A. Some of the main points." (Eastman, p. 154.) "Q. He reviewed the main points of the evidence, or what he stated to be the main points of the evidence? A. He called attention to some particularly. Q. He was calling the attention of the grand jury to the salient or main

In relation to these affidavits the prosecution had the decided advantage. The attendance of grand jurors was obtained by subpœria, and they were told by the marshal to report to the district attorney. They were accessible to him, and not to the other side. That this had its bearing I have not. the slightest doubt. All the affidavits embody statements and conclusions of the affiants which do not bear the light of cross-examination. The following will illustrate: This ap-

points in the evidence that would establish conspiracy, did he not? A. Well, the evidence would have that bearing. Q. And that is what you understood from his remarks, was it not? A. I understood from his remarks that he meant to refresh our minds in regard to the names, and so on. Q. And what they testified to? A. Possibly what they testified to. Q. And he did this in connection with the review of the law governing conspiracy. A. Yes, sir." (Clopton, p. 160.) "Q. The law of the case and the facts of the case? A. The law of the case and the evidence that had been produced. Q. The evidence. I stand corrected, Mr. Clopton. And he had a chance to make a pretty thorough review of the evidence in that time, did he not? A. I cannot recall to memory how thorough a review he may have made. He went over certain parts of the evidence, and called our attention to the facts. He gave us the names over again, of course. Our memories were refreshed in regard to some matters. Q. The names of the people that testified, or the names against whom the testimony was directed, or both? A. Well, both. Q. But the statement of the evidence, and all that, brought it to your attention to whom it was directed, did it not? A. Certainly." (Clopton, p. 161.) "Q. What was the subject-matter of that address? A. Well, summing up the evidence, as well as I remember. Q. Well, the address was devoted to summing up the evidence as given by the different witnesses? A. Yes, sir. Q. And he called your attention to that, and then called your attention to the law, did he not? A. Yes, sir. Q. Most of the time was devoted to the evidence, was it not? A. Well, I could not say which the most was devoted to. Q. He went quite fully into the evidence? A. Well; that is, as far as the important matters were concerned. Q. Well, not to say lengthy? A. Well, not lengthy. Q. But he called your attention to the different matters, so that you understood what he was referring to—the witnesses he was referring to? A. Yes, sir." (King, pp. 164, 165.) "A. Well, the main thing of his discussion was explaining the law of conspiracy. Q. He discussed the question of evidence, did he not? A. Not very much. Q. He did partially, then? A. Well, I would not say he did at all." (Trout, p. 167.) "Q. Was the matter of the evidence presented to you? A. Well, it was presented to us, about some few of the jurors, some few of the men that were to be presented. Q. What was the matter he was discussing? Just tell the court what it was. A. He was telling the jury what their duties were, what the law required them to do, and said we would have to vote on these four men to connect the chain of evidence together, as nigh as I remember. Q. You mean he would have to connect these four men, indict them along with the others— is that what you mean? A. That is the way I understood him. Q. In the second indictment? A. Yes, sir." (Wilson, pp. 85, 86.) The address was "in regard to the law and the duties of the jurymen." (Nicholson, p. 151.) "A. I remember at various times of his saying that the investigation was by instructions from Washington—the investigation itself. The remarks as to the responsibility being upon the district attorney were made after the indictment had been returned and before final adjournment." (Clopton, p. 162.) "I remember of his saying at one time something to the effect that the grand jury would soon adjourn, be scattered and gone, and no one would blame them, but that the responsibility for the indictments would rest upon him, the district attorney." (Windell, affidavit, p. 2.) "The district attorney ran the whole business." (Latham, pp. 12, 23.) Said there was enough evidence to convict. (Latham, pp. 20, 21, 28; Sloan, pp. 53, 56.)

pears (referring to the affidavit of Latham) in most of the affidavits for the prosecution:

"That it is not true, as stated therein, that the district attorney went before said grand jury without request and argued the sufficiency of the evidence and gave his opinion of the evidence, or urged the finding of the, or any, indictment against the defendant Frank Martin, or either of the defendants named in said indictment."

Yet it is true that, when before the grand jury and without request, he made an extended address in which he discussed the law and the facts, and several of the jurymen were frank enough to say that they understood the object to be the finding of an indictment against these defendants. If the foregoing language of the affidavits be construed with the utmost grammatical nicety, what the jurors said is literally true, though substantially misleading. They have said that they were left free to vote as they would, that the proceedings were fair, that they voted on their own judgment, and it is not claimed that the district attorney was present during the voting. That the jurors thought the proceedings were fair greatly preponderates, though some evidently thought otherwise. Whatever view be taken, it would be utter nonsense to say that this speech, address, argument, or whatever it may be called (for its proper designation has been questioned), was not for the purpose of securing an indictment against the persons under investigation, and who were actually indicted, and it would discredit the intelligence of the prosecutor to find that he had any other object in view. These copious quotations show that the grand jurors did not intend to say that which a technical construction of the language used in their affidavits might imply. As illustrative of this thought, the foreman of the grand jury, in referring to the district attorney, testified as follows:

"Q. Did he ever tell you, at that time or in the course of your investigations, that he wanted any one of these men indicted? A. No; he never asked for any indictment to be returned against any special one, that I remember."

He further said, having reference to this issue:

" * * * But he never directed us to ballot against any special individual."

Again, McGlinchey and five others deposed:

" * * * Nor is it true that the district attorney stated on numerous occasions, or on any occasion, that he was acting under specific instructions of the department in asking for these particular indictments against these defendants and others. * * * "

But he did state, in substance, that he did not invite or initiate the proceedings, but was acting under positive orders from the department in the prosecution. This technical differentiation runs all through the affidavits. The distinction is made between investigating the matter and asking for indictments against the particular persons under investigation, but for practical purposes this may be regarded as a refinement; for the jury would naturally understand, and it is fair to say did understand, that the indictment was urged against the persons whose names appeared on the list, which was probably, though not certainly, made in the grand jury room by the clerk, and which the district attorney submitted when he was making his re-

marks, and this at. the instance of the department. So when the jurors made affidavit, as many of them did, that they relied upon their own independent judgment in voting, it is to be borne in mind that the prosecutor had attempted to influence it by his conduct before them, and they perhaps could not tell how far their views may have been warped by what he said. They were intelligent, but inexperienced, men. The results must be weighed by the inevitable consequences which would flow from the occurrences which have been referred to. The affidavits appear to have been carried in stock. The cross-examination shows that jurors did not remember the transaction exactly alike. They varied, as witnesses will, in the details, and as to many matters which were material, yet we find that McGlinchey, Hartman, Adelmann, and Bayles made one affidavit, that Grigsby, Gess, Eastman, Clopton, King, Trout,. and Nicholson subscribed to another, and Brannon to another, that Windell and Wilson, on manifold copies of this stock form, with slight variations, subscribed to others, and that most of these affidavits are substantially identical in the language used. They consist of categorical denials, which furnish apt illustrations of negatives pregnant. This, then, is what occurred:

On the morning of · April 11th the last witness was examined by the district attorney in the grand jury room. Immediately upon the conclusion of the examination of that witness, without invitation or request, he arose and made an address upon the case, reviewing the facts, summing up the evidence, applying those facts to the law relating to conspiracy, as he explained it, at the time furnishing a list of the persons whom, as he contended, had been connected with it, all of which was done for the purpose of inducing the grand jury to return an indictment against the defendants. The remarks made amounted to an expression of opinion on his part that the defendants were guilty and should be indicted. At the conclusion of the address he said it was now "up to" the members of the grand jury to vote for or against the finding of a bill, and thereupon he left the room. It being nearly the hour for lunch, adjournment was immediately taken until 2 o'clock. Upon reassembling, pursuant to adjournment, no discussion was had, the manner of voting only being considered, whereupon it was concluded to ballot separately upon each name contained in the list, rather than upon the whole, which seemed to have been tentatively suggested, and this order of business was at once entered upon. During the balloting a juror (Latham) asked permission, as he expressed it, to explain his vote as to one of the defendants about to be balloted upon. He intended to open up a discussion as to the propriety of returning an indictment against such person, but he was declared out of order by the foreman, and so the voting proceeded. Whether there was a ballot taken upon John Doe, said to be Frank Steunenberg, at the time known by the grand jury to be dead, is not very clear; but for purposes of the present inquiry it is perhaps immaterial. The jury then adjourned. In the meantime the district attorney, who was not present during the voting, had been advised of the result of the ballots, and on the morning following he appeared with an indictment for the signature

of the foreman. Before it was signed Juror Cunningham asked him to retire, as they had a matter which they wished to discuss. The evidence is in some confusion as to just what occurred at this time. This juror testified that he intended to bring up a question relating to the ballot of the day before, with a view to reconsideration, but did not inform the district attorney as to his purpose. The fact that the district attorney in response suggested that the grand jury had been tampered with, and high words ensued between himself and the juror, shows that there was some ground for the conclusion reached by Latham and Sloan that he knew what was intended, and did not propose that discussion should be had, but insisted upon the indictment being forthwith signed. That he did not retire in compliance with this request is clearly shown. But, indulging every intendment in favor of the validity of the indictment, it must be concluded that the presumption is not overthrown by a preponderance in favor of the contention that this was intended as an arbitrary refusal to allow deliberation upon the action of the day before. The district attorney more than once during the sessions of the grand jury called attention to the fact that the whole matter was under investigation by direction of the Department of Justice, and not upon his initiation. That he told the grand jury that the responsibility would rest upon him is clearly shown. The controversy arises as to when this declaration was made. It fairly preponderates that it occurred after their labors were concluded, and when he was making what has been termed his "farewell address." He requested immediate action, as charged; but my conclusion is that it was to enable him to ascertain the names of those to be embraced in the indictment, rather than by way of forcing a vote. As to the statement that he had evidence sufficient to convict, which had not been offered, the probabilities are that this was made in regard to purely cumulative testimony; at least, it is not shown to the contrary. After his retirement from the grand jury room, had the jury desired, they could have proceeded to discuss the case. The indictment, covering 46 pages, was not read to the grand jury; but no request was made by any member for its reading. The charge that the prosecutor withheld contracts or other evidence is not sustained, and as to this jurors so asserting misunderstood the drift and conduct of the proceedings to that extent.

Defendants Martin and Pritchard are lawyers. Martin was under investigation. This the prosecutor, and, of course, the grand jury knew. He was called as a witness, without being informed that he was the subject of inquiry, and, if he had any suspicion, it must have developed from the character of the questions propounded while being examined. That he testified against himself regarding transactions vital and material to the issue is abundantly disclosed by the record. Pritchard at the time the investigation began was residing in Los Angeles. In obedience to a subpoena he left his home and journeyed to Boise, where the inquiry was in progress. He was met at the train by a deputy marshal with a warrant, and was taken into custody, although possibly the warrant was not served until afterwards. The marshal had specific instructions not to allow him to

confer with any one, but to take him directly to the office of the district attorney. Here he was questioned, and a stenographer was brought in to take down what he said. He was threatened. The threat was made to take him before the court. He was then taken before the grand jury as a witness, and questioned concerning his own connection with, and upon issues pertinent to, the charge against him, when he was under investigation, and when he did not know that this was the purpose in view. This is admitted. He was treated to such remarks as the following: "Now, you know you are lying about that." "I will put the screws to you." He was badgered by a series of questions concerning his own conduct while under arrest. These defendants were subjected to rigid cross-examination before the grand jury. They were not treated as it may be supposed other witnesses are, as they were often met with questions of this character: "Do you want this grand jury to understand?" "Do you say to this grand jury?" and the like. This concerning matters of the utmost importance as applied to the charges against them individually, and clearly implying that the object of the inquisition was to secure declarations relating to their own connection with the conspiracy and for which they were subsequently indicted upon the evidence thus taken. The examination was carried on from the standpoint of hostility, rather than friendly inquiry.

Reference has been made at this time to what occurred in relation to these defendants, not for the purpose of considering their pleas No. 3, but to illustrate the methods pursued in conducting the examination, and as throwing light upon, and giving color to, the manner of investigating the charges which were being presented to the grand jury. The conduct of the district attorney before that body was the equivalent of expressing the unqualified opinion that the evidence established the guilt of the defendants; that they ought to indict them; that the department at Washington wanted them indicted, and it was therefore the duty of the grand jury under the circumstances to do so; that the defendants Martin and Pritchard, being guilty, had in their testimony purposely lapsed into forgetfulness when they said they did not remember as to certain transactions concerning which they had been questioned. It must be concluded that the address was a plea for an indictment, substantially in manner and form as a prosecuting officer would plead for the conviction of defendants before a trial jury. These views are fortified by the failure of the district attorney to take the stand to explain or dispute the conduct attributed to him. At one stage of the proceedings he did offer to submit himself for examination; but he was informed that a controversy was being carried on between parties litigant, and he might use his own pleasure. A stenographer reported the proceedings of the grand jury. In reply to an inquiry from the court for a copy of what was said, the district attorney replied that some notes were taken by the clerk for his use, "but the reporter does not claim to have been a stenographic reporter, taking notes continuously, or taking testimony; that is the situation." Whether it was intended to create the impression that the remarks were not taken down by the stenographer at all, or that the notes made were so imperfect as to

give no adequate idea as to what was said, does not exactly appear; but what seems to be an accurate transcription of the testimony of the defendants Martin and Pritchard has been furnished, and the absence of the district attorney as a witness, or, if taken by the reporter, the failure to reproduce the remarks made by him, justify the inference that he could not have denied the strongest statement which any juror made.

These being the facts as I find them, we are brought to consider the second plea in abatement from the standpoint of the authorities.

1. State statutes control the practice, in the absence of federal enactment. Crowley v. United States, 194 U. S. 461, 24 Sup. Ct. 731, 48 L. Ed. 1075; United States v Clune (D. C.) 62 Fed. 798: United States v. Mitchell (C. C.) 136 Fed. 909; United States v. Eagan (C. C.) 30 Fed. 612. There are several answers to the technical objection that the defendants have not properly raised the issue by pleas in abatement:

The state statute does not seem to point out any method whereby the identical question which is here presented may be raised at all. If it should be literally followed, defendants would be denied the right to challenge the proceedings. It is manifest that it could not be invoked to that extent.

Pleas in abatement for the purpose of presenting issues not shown by the record have been repeatedly recognized as pursuing the proper practice. Agnew v. United States, 165 U. S. 44, 17 Sup. Ct. 235, 41 L. Ed. 624; Tarrance v. Florida, 188 U. S. 523, 23 Sup. Ct. 402, 47 L. Ed. 572; United States v. Gale et al., 109 U. S. 65, 3 Sup. Ct. 1, 27 L. Ed. 857; Bishop's New Crim. Procedure, vol. 1, §§ 791, 861; Thompson & Merriam on Juries, §§ 543, 687; Wharton's Criminal Prac. & Pl. (9th Ed.) 388.

If there was any merit originally in the contention, it was waived when the affidavits of 16 jurymen were filed in answer to those which had been filed and attached to the plea in abatement. The issue as tendered by the defendants was accepted, and it is now too late to contend that they failed to pursue the proper remedy.

2. In considering the conduct of the district attorney we are compelled to recur to fundamentals. The provision of the fifth amendment of the Constitution that "no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment by a grand jury, except," etc., is a reproduction of Magna Charta, which imposed the same restraint in this language:

"No man shall be taken (that is) restrained of liberty by petition or suggestion to the king or to his councill, unless it be by indictment or presentment of good and lawfull men, where such deeds be done."

Our constitutional limitation relates only to offenses committed against the laws of the United States. Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. 292, 28 L. Ed. 232; McNulty v. California, 149 U. S. 645, 13 Sup. Ct. 959, 37 L. Ed. 882; Nordstrom v. Washington State, 164 U. S. 705, 17 Sup. Ct. 997, 41 L. Ed. 1183. The offense charged is infamous, and can only be tried upon indictment. United States v. Gale et al., 109 U. S. 65, 3 Sup. Ct. 1, 27 L. Ed. 857; Ex parte

Wilson, 114 U. S. 426, 5 Sup. Ct. 935, 29 L. Ed. 89; Mackin v. United States, 117 U. S. 348, 6 Sup. Ct. 777, 29 L. Ed. 909; Parkinson v. United States, 121 U. S. 282, 7 Sup. Ct. 896, 30 L. Ed. 959; Ex parte Bain, 121 U. S. 1, 7 Sup. Ct. 781, 30 L. Ed. 849; In re Claasen, 140 U. S. 205, 11 Sup. Ct. 735, 35 L. Ed. 409. The rights of the defendants are to be measured by the grand jury system as it existed and was understood at the time of its adoption. At the common law the prosecutor had no right to attend the sessions. It is even doubtful whether he had a right, unsolicited, to send indictments to the inquisitorial body for consideration. Edwards on The Grand Jury, pp. 110, 111, 113. It is a familiar historical fact that the system was devised to prevent harassments growing out of malicious, unfounded, or vexatious accusations. That it serves the purpose of allowing prosecutions to be initiated by the people themselves in no way detracts from the fact that it still stands as a safeguard against arbitrary or oppressive action; and so it has often been authoritatively declared. In his dissenting opinion in Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. 292, 28 L. Ed. 232 (the majority opinion in no way conflicts upon this point), Mr. Justice Harlan commended this from Story's Constitution:

"Grand juries perform most important public functions, and are a great security to the citizens against vindictive prosecutions either by the government, or by political partisans, or by private enemies."

The following from Wilson's Works was also quoted with approval:

" * * * Among all the plans and establishments which have been devised for securing the wise and uniform execution of the criminal laws, the institution of grand juries holds the most distinguished place. This institution is, at least in the present times, the peculiar boast of the common law. The era of its commencement, and the particulars attending its gradual progress and improvement, are concealed behind a thick veil of very remote antiquity. But one thing concerning it is certain. In the annals of the world there is not found another institution so well adapted for avoiding all the inconveniences and abuses, which would otherwise arise from malice, from rigor, from negligence, or from partiality in the prosecution of crimes."

Mr. Justice Field, in his charge to a grand jury (2 Sawy. 668), speaking of the institution, said:

"It was at the time of the settlement of this country, an informing and accusing tribunal, without whose previous action no person charged with a felony could, except in certain special cases, be put upon his trial. And in the struggles which at times arose in England between the powers of the king and the rights of the subject it often stood as a barrier against persecution in his name, until at length it came to be regarded as an institution by which the subject was rendered secure against oppression from unfounded prosecutions of the crown. In this country, from the popular character of our institutions, there has seldom been any contest between the government and the citizen which required the existence of the grand jury as a protection against oppressive action of the government. Yet the institution was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means not only of bringing to trial persons accused of public offenses upon just grounds, but also as the means of protecting the citizen against unfounded accusation, whether it comes from the government, or be prompted by partisan passion or private enmity. * * * Into every quarter of the globe in which the Anglo-Saxon race have formed settlements, they have carried with them this

time-honored institution, ever regarding it with the deepest veneration, and connecting its perpetuity with that of civil liberty."

This learned judge observed that the grand jury was to be regarded as standing against "oppressions of power, the virulence of malice, and the intemperance of prejudice." Here the grand jury was duly qualified and impaneled, and it remains to inquire whether the occurrences already related were of such a nature as to infringe the constitutional rights of the defendants. To this end reference must be had to the decisions.

The district attorney should not give advice or express his opinion as to the sufficiency of the evidence. In re District Attorney of the United States, Fed. Cas. No. 3,925 (vol. 7, p. 745); Ex parte Crittendon, Fed. Cas. No. 3,393a (vol. 6, p. 822); Commonwealth v. Frey (Quart. Sess.) 11 Pa. Co. Ct. R. 523; Edwards on The Grand Jury p. 127 He cannot advise upon the law. United States v Kilpatrick (D. C.) 16 Fed. 766. He has no right to be present during the deliberations of the grand jury. Charge to Grand Jury, Fed. Cas. No. 18,255 (vol. 30, p. 992), 2 Sawy. 667. State v. Adam, 40 La. Ann. 745, 5 South. 31; Commonwealth v. Bradney et al., 126 Pa. 199, 17 Atl. 600; Rothschild v. State, 7 Tex. App. 519; Edwards on The Grand Jury, p. 128. The great justice, in his charge to the grand jury, supra, said:

"The district attorney has the right to be present at the taking of testimony before you, for the purpose of giving information or advice touching any matter cognizable by you, and may interrogate witnesses before you; but he has no right to be present pending your deliberations on the evidence."

Wharton in his Criminal Pleading and Practice (9th Ed. § 366), quotes from and comments upon this charge, as follows:

"It is proper in this connection to keep in mind the fact, already noticed, that the only valid basis on which the institution of grand juries rests is that they are an independent and impartial tribunal between the prosecution and the accused; and it is the duty of the courts to refuse to tolerate any practice which conflicts with this independence and impartiality. * * * And in any view the presence of counsel for the prosecution, public or private, during the deliberations of the jury, should be ground for quashing the bill, unless it appear that there was no interference by such counsel in any degree with the freedom of such deliberations. The purpose of the institution of grand juries was, as we have seen, to interpose a check upon the sovereign; and they would cease to answer this purpose, and would increase the danger they were intended to avert, if they should be put under the official direction of the prosecuting authorities of the state."

The attendance before the grand jury of a special prosecutor appointed by the court under the misapprehension that the prosecuting attorney was disqualified is prejudicial error, and the indictment should be quashed. State v. Heaton, 21 Wash. 59, 56 Pac. 843. Where an attorney employed to assist in a prosecution was before the grand jury during their investigation of the case at the request of the district attorney, it was held that this was not ground for setting aside the indictment or for reversing a judgment of conviction. State v. Whitney, 7 Or 386. To the same effect is United States v. Terry (D. C.) 39 Fed. 355.

Since the states are not controlled by the limitation of the federal Constitution, being free to adopt, modify, or reject the grand jury system altogether, they have not always retained it as it existed when the fifth amendment was adopted. In the main, however, through tradition and otherwise, certain general features have been preserved. Speaking of the powers and duties of a prosecuting officer, the general rule is thus laid down in 20 Cyc. p. 1338:

"But he cannot participate in the deliberations, or express opinions on questions of fact or as to the weight and sufficiency of evidence, or attempt in any way to influence the finding."

To this proposition cases are cited from Alabama, Arkansas, Illinois, Indiana, Louisiana, Mississippi, Pennsylvania, and South Carolina. In the same connection it is said that the mere presence of the prosecutor with the consent of the grand jury while deliberating or voting on a charge will not constitute such an irregularity as, in the absence of injury or prejudice to the accused, will invalidate the indictment. Authorities to sustain this statement are cited from Alabama, Arkansas, Iowa, Illinois, Indiana, Pennsylvania, and Utah. These principles are not inconsistent. The fundamental idea which runs through the statutes and decisions apparently is that the prosecutor must remain neutral, must be impartial, must not undertake to control the finding by undue influence.

United States v. Mitchell (C. C.) 136 Fed. 896, has been cited by the prosecution. It was there urged that the district attorney had "greatly influenced the grand jury to find this indictment." But the court found that there was no specific charge. The general allegation was discarded with these observations:

"Instead of conclusions and opinions, there must be something tangible, justifying a presumption of injury to the defendant in a substantial right, before the court will interfere, assuming that it ought to do so upon any state of facts of the character indicated."

In United States v. Cobban (C. C.) 127 Fed. 722, relied upon by counsel, the action of the district attorney was regarded by the court as "overzealous," but not prejudicial.

Remembering, now, that at the common law the prosecuting officer had no right to attend the sessions of the grand jury at all, and that it is only by virtue of statutes and modified procedure that he may now be present in the grand jury room, we are to conform the practice as near as may be to the statutes of Idaho, and in doing so we find that section 5311, Pen. Code 1901, provides:

"The grand jury may, at all reasonable times, ask the advice of the court, or the judge thereof, or of the prosecuting attorney; but unless such advice is asked, the judge of the court must not be present during the sessions of the grand jury. The prosecuting attorney of the county may at all times appear before the grand jury for the purpose of giving information or advice relative to any matter cognizable by them, and may interrogate witnesses before them whenever they or he thinks it necessary; but no other person is permitted to be present during the session of the grand jury, except the members and witnesses actually under examination, and an interpreter when necessary, and no person must be permitted to be present during the expressions of their opinions, or giving their votes upon any matter before them."

Giving the doctrine that the state statutes relating to practice prevail in the federal courts the greatest latitude, and this section, considering the grand jury system as administered by them its widest meaning, it must be held, in the absence of state construction, that the provision that the prosecuting attorney may at all times appear before the grand jury for the purpose of giving information or advice relative to any matter cognizable by them, was meant to confine him to those traditional duties of giving advice concerning procedure and the like, to the examination of witnesses, as expressly provided, and not to the expression of opinions or the making of arguments. The following may be deduced as the general rule applicable to federal grand juries:

If the district attorney, through inadvertence, without intending to influence the grand jury, is present during its deliberations, or even during the taking of a vote, it is not necessarily fatal to its action by bill returned. It does not always result that an indictment will be quashed. It depends upon circumstances. On the contrary, it does follow that, where the prosecutor not only expresses his opinion, but urges the finding of an indictment, and it is clearly shown that the grand jury must necessarily have been influenced, whether consciously or unconsciously, prejudice will be presumed. Where the conduct is overpowering in its nature, where it inheres in the investigation, where it permeates everything, where it overshadows, as it did in this case, coming from a prosecutor of such profound ability, it is perfectly apparent that it was prejudicial. The court has occasion to know that there was no ground for the return of the indictment as to one of the defendants, for it must be assumed that the same evidence was adduced upon the trial that was offered to the grand jury. On the other hand, there was abundant evidence to justify the return of a bill as to certain other defendants, and here it will naturally occur that as to those defendants against whom there was sufficient evidence the indictment should be upheld, and be quashed as to those against whom it was insufficient. The difficulty with this procedure inheres in the system. In discussing the right to sustain an indictment by striking out what was considered as surplusage, Mr. Justice Miller, in Ex parte Bain, 121 U. S. 9, 7 Sup. Ct. 786, 30 L. Ed. 849, in answer to the argument that the grand jury would have returned the indictment in any event, said:

"He goes on to argue that the grand jury would have found the indictment without this language. But it is not for the court to say whether they would or not. The party can only be tried upon the indictment as found by such grand jury, and especially upon all its language found in the charging part of that instrument."

Where is the differentiation to begin and end? How shall the distinction be made without at once substituting an opinion here and assuming the functions of the grand jury? If this indictment can be sustained upon these admitted facts, then any citizen, upon the assurances of a prosecuting officer, or upon a partisan argument, may be held to answer without having had the benefit of an investigation by that impartial tribunal which the Constitution has established;

and this particularly applies to conspiracy. The authorities agree that a district attorney cannot share in the deliberations of a grand jury. When counsel was making his address, the grand jury was deliberating. He shared in that deliberation, and expressed his opinion as fully as any member could have done. He was present during the whole time that the jury was engaged in deliberating, for no discussion was had in the grand jury room or among the grand jurors after the close of the testimony, except that which he indulged. It is true there was an opportunity to deliberate afterwards; but no discussion took place, and nothing was subsequently done, except to vote upon the names which the prosecutor had discussed and designated in the list which he submitted. It cannot be said that the grand jurors were deliberating while voting, in the sense in which it is used in the books, and with that meaning in view which attends the rule that the deliberations must be confined to the members and cannot be participated in by any one else; and since the prosecutor cannot share in the deliberations, in view of the unusual and extraordinary proceeding before the grand jury, it is difficult to see how it can be concluded that there was no prejudice, even if it be said that the evidence was sufficient for the return of the indictment, where the contention is met with the proposition that one defendant at least was presented without sufficient evidence. If prejudicial to him, it was to other defendants.

The Department of Justice has ever stood for constitutional rights, and if in the performance of its legitimate functions it intrusted to the officer appointed for that purpose the presentment of persons who in its judgment had violated the law, it had a right to assume that the ordinary methods of procedure would be followed; and if that officer for the time overstepped the bounds, while it must be denominated as unfortunate, it cannot be upheld. It was proper, of course, for the department, which had no other hand in the matter, to direct that this or any other charge be presented to a grand jury, and in doing so to name the persons against whom accusation should be made; but it was improper that this should have been communicated to the jury. Nor can it be said that this statement, standing alone, would necessarily be prejudicial; but upon the proofs here it is manifest that to sustain this indictment would be to establish a precedent to which political partisanship, religious intolerance, or antireligious intolerance—for the latter is quite as apt to exist as the former—could point as a justification for upholding the return of an indictment through popular demand, public excitement, persecution, or personal ill will. We will do well to adhere to old landmarks and established principles, which are quite sufficient for bringing to trial all who are guilty of an infraction of the laws of the land. If it be competent to do that which it is admitted the prosecutor did in this case, then the grand jury system has ceased to stand for that for which it anciently stood, and for which it was adopted in this country. The Supreme Court has said that it is better that a prisoner should escape altogether than that a judgment of conviction for an infamous crime should be sustained where the record does not show that there was a valid trial. Crain v. United States, 162 U. S. 625, 16 Sup. Ct. 952, 40 L. Ed. 1097.

Upon the whole record it appears that a commendable zeal, which gathered force as it progressed, finally expanded into an exaggerated partisanship wholly inconsistent with the semijudicial duties of a public prosecutor, and entirely unnecessary in the execution of the powers reposed, and particularly in this case, where there could have been no necessity in bringing real offenders to justice. The language of the Supreme Court in Ex parte Wilson, 114 U. S. 426, 5 Sup. Ct. 939, 29 L. Ed. 89, is important:

"But the Constitution protecting every one from being prosecuted, without the intervention of a grand jury, for any crime which is subject by law to an infamous punishment, no declaration of Congress is needed to procure, or competent to defeat the constitutional safeguard."

All this without overlooking the fact that the jurors testified that they were not influenced by what occurred; but this is hardly possible. We have seen that they were by some method induced to do that which the evidence, or rather want of evidence, before them could not justify; and the fact that the prosecutor at the conclusion of his address told them in effect that they were the judges of the matter did not withdraw from them the influence and effect of his remarks, nor restore that unbiased equipoise which, from the time of the institution of the grand jury system, has been one of its principal features. Whether the defendants should in fact be brought to trial is not the question. It is whether they should be brought to trial in the manner provided by law, and whether their substantial rights have been invaded. There is no surer road to anarchy than for the courts to assume legislatve power by stretchng statutory enactments and importing into them penalties not fixed by law, or to extend procedure to such an extent as to invade constitutional rights. The power is with the people to declare all rights and to supply all remedies, and the tribunals created for enforcing the law and the officers appointed to aid in that regard should act strictly within their delegated powers. If a grand jury not properly organized as such, for instance, with less than the number required by the statute, should present even a guilty man for trial, his rights would be invaded, and it would not for a moment be contended that such a proceeding, as against a timely plea, could have validity; and the Supreme Court has cited numerous instances which would render proceedings altogether void. United States v. Gale, 109 U. S. 71, 3 Sup. Ct. 1, 27 L. Ed. 857.

It follows that plea No. 2 of the defendants Wells and Downs must be sustained. All other identical pleas, which were duly interposed and submitted, if timely and not subsequently waived by other pleas or attacks upon the indictment, will take the same course; but the defendants will be held to bail pending such further proceedings as the prosecution may desire to take.

It is gratifying to observe that Congress recently passed an act providing for a review of decisions of this character. If the position of the prosecution regarding the statute of limitations is sound, there would appear to have been no reason why the pleas might not have been confessed and the matter have been resubmitted to a grand

jury which was in attendance in October, as then suggested. The last overt act is charged to have been committed on January 31, 1905. The court does not feel responsible for the condition which has been presented, nor is there reasonable ground to suppose that the grand jury would have refused to vote an indictment against such of the defendants as the evidence seemed clearly to connect with the fraudulent transaction; for, whatever may have been the derelictions of trial juries, the refusal of grand juries to find indictments has not been one of the difficulties attending prosecutions, and, when a grand jury improperly refuses to return a bill, courts have power, and will upon proper representation of the district attorney, at once call another jury to investigate the same matter.