## BECK *v.* WASHINGTON.

No. 40.   Argued November 14, 1961.—Decided May 14, 1962.

*Charles S. Burdell* argued the cause and filed briefs for petitioner. *Donald McL. Davidson* entered an appearance for petitioner.

*James E. Kennedy* argued the cause for respondent. With him on the briefs was *William L. Paul, Jr.*

MR. JUSTICE CLARK delivered the opinion of the Court.

Petitioner David D. Beck contends that his conviction of grand larceny in the Superior Court of the State of Washington for King County is invalid under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. This contention is based primarily on what is characterized as voluminous and continuous adverse publicity circulated by news media in the vicinity of Seattle, Washington, where he was indicted and tried. Specifically he claims, *inter alia,* that the grand jury was unfairly impaneled and instructed, that the prosecutor acted improperly before the grand jury, and that his motions for a change of venue and for continuances were erroneously denied. The judges of the Supreme Court of Washington divided equally in review, 56 Wash. 2d 474, 349 P. 2d 387, 353 P. 2d 429, leaving petitioner's conviction undisturbed. We granted certiorari limited to the above contentions, 365 U. S. 866, and we now affirm the conviction.

## I. THE PUBLICITY OF WHICH PETITIONER COMPLAINS.

In addition to challenges to the grand and petit juries, petitioner prior to the selection of the petit jury made five motions on the ground of bias and prejudice arising

from the publicity, *viz.*, one to quash the indictment, three for continuances ranging from one month to an indefinite period, and one for a change of venue to Snohomish or Whatcom County. Petitioner's counsel supported his factual contentions in regard to these various motions by his personal affidavits as well as by photostats of stories appearing in local newspapers and national magazines. We shall now summarize the highlights of the publicity set forth by the petitioner in his moving papers and exhibits.

The Select Committee on Improper Activities in the Labor or Management Field of the United States Senate began its investigation on February 26, 1957. In early March the Chairman of the Committee announced that the Committee had "produced 'rather conclusive' evidence of a tie-up between West Coast Teamsters and underworld bosses to monopolize vice in Portland, Ore." The announcement also stated that "Teamsters' President Dave Beck and Brewster [also a Teamster leader] will be summoned for questioning on a charge that they schemed to control Oregon's law enforcement machinery from a local level on up to the governor's chair."

On March 22 the Committee was quoted in the newspapers as stating "$250,000 had been taken from Teamster funds . . . and used for Beck's personal benefit." Petitioner appeared before the Committee on March 26, and the newspapers reported: "BECK TAKES 5TH AMENDMENT President of Teamsters 'Very Definitely' Thinks Records Might Incriminate Him." Television cameras were permitted at the hearings. One Seattle TV station ran an 8¾-hour "live" broadcast of the session on March 27, and films of this session were shown by various TV stations in the Seattle-Tacoma area. The April 12 issue of the U. S. News & World Report ran a caption: "Take a look around Seattle these days, and you find what a Senate inquiry can do to a top labor leader

in his own home town." On April 26 the county prosecutor announced that a special grand jury would be impaneled in Seattle "to investigate possible misuse of Teamsters Union funds by international president Dave Beck . . . ." It was later announced that former Mayor Devin of Seattle was to be appointed Chief Special Prosecutor. On May 3 petitioner was indicted by a federal grand jury at Tacoma for income tax evasion. The announcement of this action was of course in front-page headlines. Five days later the petitioner was again called as a witness before the Committee in Washington. News stories on his appearance concentrated on his pleading of the Fifth Amendment 60 times during the hearings. Other stories emanating from the Committee hearings were featured intermittently, and on May 20, the day of the convening of the special grand jury, the Chairman of the Senate Committee announced that "the Committee has not convicted Mr. Beck of any crime, although it is my belief that he has committed many criminal offenses." The publicity continued to some degree after the grand jury had been convened and during the three-week period in which the prosecutors were gathering up documentary evidence through the use of grand jury subpoenas. Among other stories that appeared was one of June 4 stating that at the Committee hearings "Beck, Jr., who even refused to say whether he knew his father, took shelter behind the [fifth] amendment 130 times, following the example of Beck, Sr., who refused to answer 210 times in three appearances before the committee." The indictment in this case was returned by the special grand jury on July 12 and of course received banner headlines. Intermittent publicity continued, some from Washington, D. C., until August 28 when a federal grand jury indicted petitioner and others on additional income tax evasion counts. The co-conspirators named in this latter indictment were then called before the Committee in Washing-

ton, and these hearings, which were held on November 5, brought on additional publicity. On November 12 Dave Beck, Jr., went to trial on other larceny charges and was convicted on November 23, a Saturday. The state papers gave that event considerable coverage. The trial of petitioner in this case began on December 2 and continued until his conviction on December 14.

## II. The Objections to the Grand Jury Proceedings.

Ever since *Hurtado* v. *California,* 110 U. S. 516 (1884), this Court has consistently held that there is no federal constitutional impediment to dispensing entirely with the grand jury in state prosecutions. The State of Washington abandoned its mandatory grand jury practice some 50 years ago.[1] Since that time prosecutions have been instituted on informations filed by the prosecutor, on many occasions without even a prior judicial determination of "probable cause"—a procedure which has likewise had approval here in such cases as *Ocampo* v. *United States,* 234 U. S. 91 (1914), and *Lem Woon* v. *Oregon,* 229 U. S. 586 (1913). Grand juries in Washington are convened only on special occasions and for specific purposes. The grand jury in this case, the eighth called in King County in 40 years, was summoned primarily to investigate circumstances which had been the subject of the Senate Committee hearings.

In his attempts before trial to have the indictment set aside petitioner did not contend that any particular grand juror was prejudiced or biased. Rather, he asserted that the judge impaneling the grand jury had breached his duty to ascertain on *voir dire* whether any prospective juror had been influenced by the adverse publicity and that this error had been compounded by his failure to ade-

---

[1] Washington Laws 1909, c. 87.

quately instruct the grand jury concerning bias and prejudice. It may be that the Due Process Clause of the Fourteenth Amendment requires the State, having once resorted to a grand jury procedure, to furnish an unbiased grand jury. Compare *Lawn* v. *United States,* 355 U. S. 339, 349–350 (1958); *Costello* v. *United States,* 350 U. S. 359, 363 (1956); *Hoffman* v. *United States,* 341 U. S. 479, 485 (1951). But we find that it is not necessary for us to determine this question; for even if due process would require a State to furnish an unbiased body once it resorted to grand jury procedure—a question upon which we do not remotely intimate any view—we have concluded that Washington, so far as is shown by the record, did so in this case.

Petitioner's appearance before the Senate Committee was current news of high national interest and quite normally was widely publicized throughout the Nation, including his home city of Seattle and the State of Washington. His answers to and conduct before the Committee disclosed the possibility that he had committed local offenses within the jurisdiction of King County, Washington, against the laws of that State. In the light of those disclosures the King County authorities were duty-bound to investigate and, if the State's laws had been violated, to prosecute the offenders. It appears that documentary evidence—in the hands of petitioner's union—was necessary to a complete investigation. The only method available to secure such documents was by grand jury process, and it was decided therefore to impanel a grand jury. This Washington was free to do.

Twenty-three prospective grand jurors were called. The trial judge explained, as is customary in such matters, that they had been called primarily to investigate possible crimes committed in King County by officers of the Teamsters Union which had been the subject of the Senate Committee hearings. In impaneling the grand jury the

judge, after determining their statutory qualifications, businesses, union affiliations and the like, asked each of the prospective jurors: "Is there anything about sitting on this grand jury that might embarrass you at all?" In answer to this or the question of whether they were conscious of any prejudice or bias, which was asked whenever previous answers suggested a need for further inquiry, two admitted they were prejudiced by the publicity and were excused. Another stated that whether he was prejudiced was "pretty hard to answer," and he, too, was excused. In addition three persons who were or had been members of unions that were affiliated with petitioner's union were excused. The remaining 17 were accepted and sworn as grand jurors and as a part of the oath swore that they would not "present [any] person through envy, hatred or malice." Among them were a retired city employee who had been a Teamster, the manager of a real estate office, a bookkeeper, an engineer, an airplane manufacturer's employee, a seamstress whose husband was a union member, a material inspector, a gravel company superintendent who was a former Teamsters Union member, a civil engineer with the State Department of Fisheries, and an engineer for a gyroscope manufacturer.

In his charge to the grand jury the trial judge explained that its "function is to inquire into the commission of crime in the county," that ordinarily this was done "by the regularly established law enforcement agencies," but that this was impossible here because further investigation was necessary requiring the attendance of witnesses and the examination of books and records which a prosecutor had no power to compel. As to the purpose for which it was called, he explained that "disclosures" by the Senate Investigating Committee indicated "hundreds of thousands of dollars of the funds" of the Teamsters Union had been "embezzled or stolen" by its officers. He also stated that the president of the Teamsters had "publicly

declared" that the money he had received was a loan. "This presents a question of fact," he added, "the truth of which is for you to ascertain." After mentioning other accusations he concluded, "I urge you to do all that you can within practical limitations to ascertain the truth or falsity of these charges. . . . You have a most serious task to perform . . . . It is a tremendous responsibility, and I wish you well in your work."

It is true that the judge did not admonish the grand jurors to disregard or disbelieve news reports and publicity concerning petitioner. Nor did he mention or explain the effect of the invocation of the Fifth Amendment by petitioner before the Committee or inquire as to the politics of any panel member. Discussion along such lines might well have added fuel to the flames which some see here. Apparently sensing this dilemma the judge admonished the grand jury that its function was to inquire into the commission of crime in the county and that it was to conduct an examination of witnesses as well as books and records. Twice in his short statement he said that it was for the grand jury to determine whether the charges were true or false. Taking the instructions as a whole, they made manifest that the jurors were to sift the charges by careful investigation, interrogation of witnesses, and examination of records, not by newspaper stories.

In the light of these facts and on the attack made we cannot say that the grand jury was biased. It was chosen from the regular jury list. Some six months thereafter a petit jury to try this case was selected from the same community and, as will hereafter be shown, was not found to be prejudiced. Indeed, every judge who passed on the issue in the State's courts, including its highest court, has so held. A look at the grand jury through the record reveals that it was composed of people from all walks of life, some of whom were former union members. The judge immediately and in the presence of all of the panel

eliminated six prospective grand jurors when indications of prejudice appeared. No grand juror personally knew petitioner or was shown to be adverse to the institutions with which petitioner is generally identified. Every person who was selected on the grand jury took an oath that he would not indict any person through "hatred or malice." Moreover, the grand jury sat for six weeks before any indictment was returned against petitioner. The record also indicates that it heard voluminous testimony on the charges that had been made against petitioner and others and that it gave the matter most meticulous and careful consideration. We therefore conclude that petitioner has failed to show that the body which indicted him was biased or prejudiced against him.

In addition to the above due process contention three equal protection arguments are made by petitioner or suggested on his behalf. First, petitioner argues he is a member of a class (Teamsters) that was not accorded equal treatment in grand jury proceedings. The contention is based on references to the Teamsters by the judge impaneling the grand jury as he conducted the *voir dire* and explained the scope of the investigation. The complete answer to petitioner's argument is that references to the Teamsters were necessary in the *voir dire* to eliminate persons who might be prejudiced for or against petitioner and in the instructions to explain the purpose and scope of this special body. Petitioner has totally failed to establish that non-Teamsters who are members of groups under investigation are given any different treatment.

Secondly, it is said that the Washington statute permitting persons in custody to challenge grand jurors, Revised Code of Washington § 10.28.030, denies equal protection to persons not in custody who are investigated by grand juries. This point is not properly before this Court. Although both opinions of the Washington Supreme Court discuss the *interpretation* of § 10.28.030,

neither considered that question in light of the equal protection argument for that argument was never properly presented to the court in relation to this statute. The Washington Supreme Court has unfailingly refused to consider constitutional attacks upon statutes not made in the trial court, even where the constitutional claims arise from the trial court's interpretation of the challenged statute. *E. g., Johnson* v. *Seattle,* 50 Wash. 2d 543, 313 P. 2d 676 (1957).[2] Petitioner's formal attack at the trial court level did not even mention § 10.28.030, much less argue that a restrictive interpretation would be unconstitutional under the Equal Protection Clause.[3] That the

---

[2] *Washington* v. *Griffith,* 52 Wash. 2d 721, 328 P. 2d. 897 (1958), does not detract from this principle. In *Griffith* the Washington Supreme Court, while recognizing the general rule that constitutional arguments cannot be presented for the first time in the Supreme Court, found an exception to this general rule when the accused in a capital case asserts his court-appointed attorney incompetently conducted his trial. The reasons for such an exception are obvious, and it is just as obvious that such reasons are not applicable to the present case.

[3] Petitioner made the following attacks upon the grand jury:

"MOTION TO SET ASIDE AND DISMISS INDICTMENT—Filed
October 18, 1957

"Comes Now David D. Beck, also known as Dave Beck, defendant herein, by and through his attorneys of record herein, and respectfully moves to set aside and dismiss the indictment on the following grounds:

"1. That the grand jurors were not selected, drawn, summoned, impaneled or sworn as prescribed by law.

"2. That unauthorized persons, not required or permitted by law to attend sessions of the grand jury were present before the grand jury during the investigation of the allegations of the indictment.

"3. That persons other than the grand jurors were present before the grand jury during consideration of the matters and things charged in the indictment.

"4. That the proceedings of the grand jury which returned the indictment were conducted in an atmosphere of extreme bias, prejudice and hostility toward this defendant, and that said atmosphere

prosecution and the court viewed petitioner as outside the scope of § 10.28.030 was brought home to him in the course of the trial court proceedings on his grand jury attack. But even then petitioner did not suggest that constitu-

was in part created by the Prosecuting Attorney and by persons acting or claiming to act upon his behalf; all of which was prejudicial to this defendant and which has denied and will continue to deny him rights guaranteed under the 14th Amendment of the Constitution of the United States, Amendment 10 of the Constitution of the State of Washington, and Article I, § 3 of the Constitution of the State of Washington.

"5. That by reason of extreme bias, prejudice and hostility toward the defendant herein, contributed to in part by the conduct of the Prosecuting Attorney and persons acting or claiming to act upon his behalf, it is and will be impossible for the defendant to secure and obtain a fair and impartial trial in the jurisdiction of this Court, all of which is and will be prejudicial to this defendant and which will constitute a denial of his rights guaranteed under the 14th Amendment of the Constitution of the United States, Amendment 10 of the Constitution of the State of Washington, and Article I, § 3 of the Constitution of the State of Washington.

"6. That the Court erred in its instructions and directions to the Grand Jury to the prejudice of the defendant and in denial of rights guaranteed under the 14th Amendment of the Constitution of the United States, Amendment 10 of the Constitution of the State of Washington, and Article I, § 3 of the Constitution of the State of Washington.

"7. That there were excluded from the Grand Jury persons of defendant's financial, social and business class and occupation, contrary to the 14th Amendment to the Constitution of the United States, and contrary to Article I, § 3 of the Constitution of the State of Washington.

"8. That the defendant herein was required and compelled to give evidence against himself, contrary to the provisions of Article I, § 9 of the Constitution of the State of Washington and the 5th and 14th Amendments of the Constitution of the United States.

"9. That the Grand Jury committed misconduct in violation of RCW 10.28.085 and RCW 10.28.100.

"This motion is based upon all of the files, records, transcripts, exhibits and affidavits herein."

tional considerations might compel a different result. The failure to inject the equal protection contention into the case was carried forward to the proceedings before the Washington Supreme Court when petitioner failed to comply with that court's rule prescribing the manner in which contentions are to be brought to its attention. Rule 43 of the Rules on Appeal, Revised Code of Washington, provides that "[n]o alleged error of the superior court will be considered by this court unless the same be definitely pointed out in the 'assignments of error' in appellant's brief." Mere generalized attacks upon the validity of the holding below as petitioner made in his "assignments of error" [4] are not considered by reason of

"CHALLENGE TO GRAND JURY—Filed October 18, 1957

"Comes Now the defendant herein and challenges each and all of the members of the grand jury which returned the indictment herein for the reason and on the grounds that the Court which impaneled said grand jury made no determination as to whether a state of mind existed on the part of any juror such as would render him unable to act impartially and without prejudice."

[4] Petitioner's 29 "assignments of error" included the following:

"6. The lower court erred in denying appellant's motion to set aside and dismiss the indictment.

"7. The lower court erred in denying appellant's challenge to grand jury.

.          .          .          .          .

"25. The court denied appellant's rights to a fair and impartial grand jury."

However, when petitioner did attempt to conform to the rule of the Washington Supreme Court by pointing out "definitely" the errors committed in denying his attacks upon the grand jury, he limited the review to violations of the Due Process Clause as set out below.

"29. The appellant was denied due process of law under the Fourteenth Amendment of the Constitution of the United States of America and under the Tenth Amendment of the Constitution of the State of Washington, as follows:

"a. by denying appellant his right to challenge the grand jury or to dismiss the indictment for bias and prejudice of the grand jury members.

this rule sufficient to invoke review of the underlying contentions. See, *e. g., Washington* v. *Tanzymore,* 54 Wash. 2d 290, 292, 340 P. 2d 178, 179 (1959); *Fowles* v. *Sweeney,* 41 Wash. 2d 182, 188, 248 P. 2d 400, 403, (1952). Nor will the Washington Supreme Court search through the brief proper to find specific contentions which should have been listed within the "assignments of error." See *Washington ex rel. Linden* v. *Bunge,* 192 Wash. 245, 251, 73 P. 2d 516, 518–519 (1937). Moreover, the failure of petitioner to argue the constitutional contention in his brief, as opposed to merely setting it forth as he did in one sentence of his 125-page brief, is considered by the Washington Supreme Court to be an abandonment or waiver of such contention. *E. g., Martin* v. *J. C. Penney Co.,* 50 Wash. 2d 560, 565, 313 P. 2d 689, 693 (1957); *Washington* v. *Williams,* 49 Wash. 2d 354, 356–357, 301 P. 2d 769, 770 (1956). Nor was the equal protection contention made at all in the petitions for rehearing filed after the Supreme Court had agreed with the lower court's interpretation of the statute to exclude petitioner. Assuming *arguendo* that for the purposes of our jurisdiction the question would have been timely if raised in a petition for rehearing, not having been raised there or elsewhere or actually decided by the Washington Supreme Court, the argument cannot be entertained here under an unbroken line of precedent.

"b. by denying his motions for continuance and change of venue thereby forcing appellant to go to trial in an atmosphere of extreme hostility and prejudice.

"c. by misconduct of the prosecutor

"1. during and after the grand jury proceedings, and

"2. at the trial.

"d. by denying appellant an opportunity to examine or inspect transcripts of proceedings before the grand jury after the State had introduced evidence of particular statements made before the grand jury by cross-examination or secondary evidence.

"e. the means used to accuse and convict appellant were not compatible with reasonable standards of fair play."

554

*E. g., Ferguson* v. *Georgia,* 365 U. S. 570, 572 (1961); *Capital City Dairy Co.* v. *Ohio,* 183 U. S. 238, 248 (1902). Furthermore, it was not within the scope of the questions to which the writ of certiorari in this case was specifically limited, 365 U. S. 866, and for this additional reason cannot now be presented.

The final argument under the Equal Protection Clause is that Washington has singled out petitioner for special treatment by denying him the procedural safeguards the law affords others to insure an unbiased grand jury. But this reasoning proceeds on the wholly unsupported assumption that such procedures have been required in Washington in all other cases.[5] Moreover, it is contrary to the underlying finding of the Superior Court, in denying the motion to dismiss the indictment, that the grand jurors were lawfully selected and instructed. And even if we were to assume that Washington law requires such procedural safeguards, the petitioner's argument here comes down to a contention that Washington law was misapplied. Such misapplication cannot be shown to be an invidious discrimination. We have said time and again that the Fourteenth Amendment does not "assure uniformity of judicial decisions . . . [or] immunity from

[5] There are no reported Washington cases so holding. The two cases on which this claim is predicated, *Washington* v. *Guthrie,* 185 Wash. 464, 56 P. 2d 160 (1936), and *Washington ex rel. Murphy* v. *Superior Court,* 82 Wash. 284, 144 P. 32 (1914), were concerned only with whether the members of the grand jury had been selected by chance as the law requires. Quotations from these cases when read in context clearly have reference only to the desirability of selecting grand jurors by chance. Petitioner in his rehearing petition before the Washington Supreme Court quoted from two unnamed, unreported Washington grand jury proceedings in which some prospective jurors were questioned as to bias. Even if it were clear that all the jurors in those cases were so questioned (which it is not), such isolated, unreviewable instances would not establish that Washington law requires the claimed procedures.

judicial error . . . ." *Milwaukee Electric Ry. & Light Co.* v. *Wisconsin ex rel. Milwaukee,* 252 U. S. 100, 106 (1920). Were it otherwise, every alleged misapplication of state law would constitute a federal constitutional question. Finally, were we to vacate this conviction because of a failure to follow certain procedures although it has not been shown that their ultimate end—a fair grand jury proceeding—was not obtained, we would be exalting form over substance contrary to our previous application of the Equal Protection Clause, *e. g., Graham* v. *West Virginia,* 224 U. S. 616, 630 (1912).

Petitioner also contends that a witness before the grand jury was improperly interrogated in a manner which prejudiced his case before that body. It appears that an employee of petitioner's union was called before the grand jury to testify in reference to activities within his employment. During his first appearance he made statements which he subsequently changed on a voluntary reappearance before the grand jury some two days before the indictment was returned. On the second appearance the prosecutor attacked the witness' changed story as incredible and warned him that he was under oath, that he might be prosecuted for perjury, and that there was no occasion for him to go to jail for petitioner. The record indicates that the prosecutor became incensed over the witness' new story; and though some of his threats were out of bounds, it appears that they had no effect upon the witness whatsoever for he stuck to his story. We can find no irregularity of constitutional proportions, and we therefore reject this contention.

### III. The Objections as to the Petit Jury.

As in his grand jury attack, petitioner makes no claim that any particular petit juror was biased. Instead, he states the publicity which prevented the selection of a fair grand jury also precluded a fair petit jury. He argues

that such a strong case of adverse publicity has been proved that any jury selected in Seattle at the time he was tried must be held to be presumptively biased and that the trial court's adverse rulings on his motions for a change of venue and for continuances were therefore in error. Of course there could be no constitutional infirmity in these rulings if petitioner actually received a trial by an impartial jury. Hence, our inquiry is addressed to that subject.

Petitioner's trial began early in December. This was nine and one-half months after he was first called before the Senate Committee and almost five months after his indictment. Although there was some adverse publicity during the latter period which stemmed from the second tax indictment and later Senate hearings as well as from the trial of petitioner's son, it was neither intensive nor extensive. The news value of the original "disclosures" was diminished, and the items were often relegated to the inner pages. Even the occasional front-page items were straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness. If there was a campaign against him as petitioner infers, it was sidetracked by the appearance of other "labor bosses" on the scene who shared the spotlight.

The process of selecting a jury began with the exclusion from the panel of all persons summoned as prospective jurors in the November 12 trial of Dave Beck, Jr. In addition, all persons were excused who were in the court-room at any time during the trial of that case. Next, the members were examined by the court and counsel at length. Of the 52 so examined, only eight admitted bias or a preformed opinion as to petitioner's guilt and six others suggested they might be biased or might have formed an opinion—all of whom were excused. Every juror challenged for cause by petitioner's counsel was

excused; in addition petitioner was given six peremptory challenges, all of which were exercised. Although most of the persons thus selected for the trial jury had been exposed to some of the publicity related above, each indicated that he was not biased, that he had formed no opinion as to petitioner's guilt which would require evidence to remove, and that he would enter the trial with an open mind disregarding anything he had read on the case.

A study of the *voir dire* indicates clearly that each juror's qualifications as to impartiality far exceeded the minimum standards this Court established in its earlier cases as well as in *Irvin* v. *Dowd*, 366 U. S. 717 (1961), on which petitioner depends. There we stated:

> "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*, at 723.

We cannot say the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law. Compare *Irvin* v. *Dowd, supra*, at 723–728, where sensational publicity adverse to the accused permeated the small town in which he was tried, the *voir dire* examination indicated that 90% of 370 prospective jurors and two-thirds of those seated on the jury had an opinion as to guilt, and the accused unsuccessfully challenged for cause several persons accepted on the jury. The fact that petitioner did

not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt. In addition, we note that while the Washington Supreme Court was divided on the question of the right of an accused to an impartial grand jury, the denial of the petitioner's motions based on the bias and prejudice of the petit jury did not raise a single dissenting voice.

"While this Court stands ready to correct violations of constitutional rights, it also holds that 'it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.' " *United States ex rel. Darcy* v. *Handy,* 351 U. S. 454, 462 (1956). This burden has not been met.

*Affirmed.*

MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE concurs, dissenting.

I dissent from the Court's holding because I think that the failure of the Washington courts to follow their own state law by taking affirmative action to protect the petitioner Beck from being indicted by a biased and prejudiced grand jury was a denial to him of the equal protection of the laws guaranteed by the Fourteenth Amendment.

Since 1854, when Washington was a Territory, that State has had a statute comprehensively governing the use of grand juries in criminal trials which provides in part:

> "Challenges to individual grand jurors may be made by . . . [any person in custody or held to answer for an offense] for reason of want of qualification to sit as such juror; and when, in the opinion of the court, a state of mind exists in the juror, such as would render him unable to act impartially and without prejudice." [1]

In *State ex rel. Murphy* v. *Superior Court*,[2] the Washington Supreme Court held in construing this statute that in order to preserve the right of defendants to fair and impartial grand jurors, Washington State judges must select grand jurors by chance, explaining:

> "That it was the policy of the legislature to preserve the right to have an unbiased and unprejudiced jury and grand jury, and that no suspicion should attach to the manner of its selection in all cases, cannot be questioned."

Some years later in *State* v. *Guthrie*[3] the Washington Supreme Court held that it was not only within the power of Washington State judges but it was also their duty to insure unbiased grand juries, even if so doing meant changing the composition of the grand juries selected by the rules of chance. That court in this latter case reiterated the statute's policy to preserve impartial grand

---

[1] Revised Code of Washington § 10.28.030. The bracketed portion is from § 10.28.010, a companion section relating to challenges to the entire grand jury panel. These provisions were §§ 45–46 of the original 1854 Act, Washington Territory Acts, p. 110.

[2] 82 Wash. 284, 286, 144 P. 32, 32–33.

[3] 185 Wash. 464, 475, 56 P. 2d 160, 164.

juries and made it crystal clear that juries biased because of judicial inaction are as offensive to the policy of the Washington statute as juries biased because of deliberate judicial selection:

> "While this section may be said to relate to challenges made by interested persons, it is not to be construed as denying to the court the right, upon its own motion, to excuse a juror deemed to be disqualified or incompetent. To deny this right would be out of harmony with the policy of the law, which charges the court with the responsibility of insuring that qualified and impartial grand jurors are secured."

That this state policy for impartial grand juries has been generally accepted as the settled law of Washington is demonstrated, not only by the statements of the four judges who voted to reverse this conviction,[4] but also by the current practice cited to us of other Washington trial courts.[5] Indeed, the presiding judge who impaneled the

---

[4] These four judges were of the opinion that the above-cited statute and cases required this case to be decided on the "premise that . . . [Beck], as a matter of law, was entitled to an impartial and unprejudiced grand jury," and that the "failure of the court to interrogate the jurors for the existence of possible bias and prejudice against the officers of the teamsters' union constituted prejudicial error." *State* v. *Beck*, 56 Wash. 2d 474, 519, 520, 349 P. 2d 387, 412, 413. Judge Hunter in a separate opinion stated that the requirement of impartiality "was announced as essential to a grand jury proceeding by both the legislature and the supreme court of this state, in the statutes and decisions . . . ." 56 Wash. 2d, at 537, 349 P. 2d, at 423–424.

[5] The following were quoted to us as typical *voir dire* questions asked by presiding judges in the impaneling of two recent grand juries in Washington:

" 'Q—Would there be anything in your acquaintanceship with Mr. Schuster that would in any way tend to affect your decisions in this Grand Jury investigation?

Beck grand jury made sufficient inquiries to insure that grand jurors would not be biased against the State in its investigation of Beck.

The Court, however, finds that the *Murphy* and *Guthrie* cases have no relation to the guarantee of a fair and impartial grand jury but are "concerned only with whether the members of the grand jury had been selected by chance." But even the State has taken no such position, either before the Washington Supreme Court or here. In its brief before the Washington Supreme Court the State acknowledged that the Washington statute as interpreted by the *Murphy* and *Guthrie* cases set out a "well-recognized rule" that state "grand juries should be impartial and unprejudiced." [6]   And even in this Court the State

---

" 'A—I don't think so.

" 'Q—In other words, you wouldn't have any hatred or malice or fear or favor or anything of that nature so far as your deliberating would be concerned in connection with this investigation?

" 'A—No.' "

" 'Q—From what you have heard, and I don't believe you live in a vacuum any more than the rest of us, is there anything you have read or that has been suggested by the court in these proceedings that would suggest to you why you couldn't be fair, impartial and objective in making an examination into law enforcement in this county?

" 'A—No, sir.' "

[6] The four judges who voted to reverse this conviction below relied in part upon this acknowledgment, saying:

"The state has filed a comprehensive brief consisting of one hundred fifty pages containing the following answer to appellant's argument regarding his right to an impartial and unprejudiced grand jury:

" 'Appellant asserts that the denial of his motion to set aside the indictment constituted error under our statutes and constitution and the constitution of the United States (App. Br. 35).

" ' . . . *Except for citing the well-recognized rule that grand juries should be impartial and unprejudiced* (App. Br. 37), the cases are not otherwise applicable.' " (Emphasis supplied by the Washington

does not repudiate this acknowledgment but says only that because the Washington Supreme Court was equally divided "the meaning of Washington statutes in regard to grand juries cannot be determined at this point." But of course we must decide what the Washington law is in order to pass upon Beck's claim that Washington has denied him the equal protection of the law.

The Washington statute as authoritatively interpreted by its Supreme Court in the *Murphy* and *Guthrie* cases means not only that defendants are entitled under Washington law to have indictments against them returned by impartial grand jurors but also that Washington State judges are specifically charged with the duty and responsibility of making all inquiries necessary to insure defendants against being tried on indictments returned by prejudiced grand jurors. Neither the legislature nor the State Supreme Court has ever changed that statute or its interpretation. Certainly, the equal division of judges in the Washington Supreme Court which left Beck's conviction standing did not impair the old statute or its previously established interpretation. Even Washington's own counsel tell us that "since the reasons for the Washington court being equally divided are signed by no more than four judges each, those reasons are not a decision of that court," and "are of no significance whatsoever as far as the decisional law of the state of Washington is concerned." Since the legislature has not changed its statute and the Supreme Court of Washington has not changed its interpretation of that statute, the law of Washington remains the same as it was before Beck's

Supreme Court.) Among the cases cited in appellant's state court brief to support his contention that the grand jury was not organized in accordance with state law were *Watts* v. *Washington Territory*, 1 Wash. Terr. 409; *State ex rel. Murphy* v. *Superior Court*, 82 Wash. 284, 144 P. 32; and *State* v. *Guthrie*, 185 Wash. 464, 56 P. 2d 160.

conviction was left standing by the equally divided Washington court. And as it was before, it required Washington judges to protect persons from being indicted by prejudiced and biased grand juries. If Beck has been denied that protection without the law's having been changed, then he has been singled out by the State as the sole person to be so treated. Such a singling out would be a classic invidious discrimination and would amount to a denial of equal protection of the law. We must determine, therefore, whether the grand jury that indicted Beck was impaneled in a way that violated the state law.

This question is not that which the Court treats as crucial, whether there is proof in the record that some individual grand juror was actually prejudiced against Beck, but rather the quite different question of whether the judge who impaneled the grand jury took the precautions required by the statute and its controlling judicial interpretation to insure a grand jury that would not be tainted by prejudice against Beck. I think that the record in this case shows beyond doubt that the presiding judge failed to do what the state law required him to do— try to keep prejudiced persons off the grand jury. This failure was particularly serious here because of the extraordinary opportunity for prejudgment and prejudice created by the saturation of the Seattle area with publicity hostile and adverse to Beck in the months preceding and during the grand jury hearing.

Petitioner Beck is a long-time resident of Seattle, well known to the community as president of the International Brotherhood of Teamsters and as a former president of the Western Conference of Teamsters. Beginning in March 1957, he became the target of a number of extremely serious charges of crime and corruption by the Senate Select Committee on Improper Activities in the Labor or Management Field and its staff. These charges were

given unprecedented circulation in the Seattle area.[7] On March 22–23, banner headlines proclaimed the Committee's charge that Beck had used $270,000 in Teamsters funds for his own benefit. When Beck appeared before the Committee several days later and refused to answer questions regarding the charges, he again drew headline coverage in the Seattle press: "BECK TAKES 5TH AMENDMENT." One television station went so far as to run a 9¾-hour telecast of the proceedings. On May 3, the headlines announced the fact that Beck had been indicted for federal tax evasion and that a former mayor of Seattle had received a special appointment to prosecute further charges before a state grand jury. On May 9, 15 and 16, other front-page, page-wide headlines appeared, the last charging that Beck had misused his position of union trust no less than 52 different times. On May 17, a three-column front-page story recounted the fact that Beck had pleaded the Fifth Amendment 60 times to questions from the Senate Committee. And on May 20, the day the grand jury was impaneled, headlines announced Beck's expulsion from his AFL–CIO post on the ground that "Dave Beck was found 'guilty as charged' by the A. F. of L.–C. I. O. executive council," and that same paper also carried a charge by Senator McClellan that Beck "has committed many criminal offenses." All the while radio, television, the national news magazines and the press in lesser front-page and backup stories published charges of a similar nature. This flood of intense public accusation of crime and breach of trust by prominent and highly placed persons, coupled with publicity resulting from Beck's refusal on grounds of possible self-incrimination to answer ques-

---

[7] "The amount, intensity, and derogatory nature of the publicity received by appellant during this period is without precedent in the state of Washington." 56 Wash. 2d, at 511, 349 P. 2d, at 408 (opinion of Judge Donworth for the four judges who voted to reverse).

tions before the Senate Committee as to the charges made, imposed a very heavy duty on the presiding judge under Washington law to protect Beck from a biased and prejudiced grand jury.

Far from discharging that duty, however, the judge actually increased the probability that persons biased against Beck would be left on the grand jury. For while he asked a number of questions directed toward excluding from the jury union members who might be sympathetic to Beck, he made no effective effort at all to protect Beck. Thus, he managed to ask almost every juror whether he had any connection with the Teamsters or any affiliated union, whether he knew any of the Teamsters officers, or whether he had ever been a union officer himself. But, despite his knowledge of the widespread prejudice-breeding publicity against Beck, the judge failed to ask a single juror a single question regarding whether he had read about, heard about or discussed the charges against Beck. Moreover, he failed to ask a single juror who actually sat on the jury whether he was prejudiced against Beck or had already made up his mind about the many public charges.[8] Indeed as to those jurors the most searching question which even the Court has managed to pull from the record was the sterile query: "Is there anything about sitting on this grand jury that might embarrass you at all?" Even the most tenuous logic could not equate that search for embarrassment with a search for bias and prejudice. That a search for bias and prejudice would have shown its existence hardly seems questionable, particularly in view of the fact that six months later when the publicity adverse to Beck was, according to the Court, "neither intensive nor extensive," 15 of 43 prospective petit jurors

---

[8] No prospective grand juror was asked if he was prejudiced against Beck, and only three were asked if they were conscious of bias or prejudice of any kind. Two of these were excused.

subjected to *voir dire* questioning expressed some degree of bias or prejudice in the case.[9]

After such a restrained effort toward affording Beck the protection of the unbiased grand jury assured by Washington law, it would be expected that the presiding judge would have given careful and detailed instructions to the grand jury in order to dispel any possible prejudice in their minds. Not so here, however. In fact the instructions given not only failed to cure, they made the situation worse. For instead of instructing that the testimony and charges before the Senate Committee were not evidence before the grand jury and that it would be highly improper for the grand jury to consider them at all, the presiding judge called the jury's attention to the charges of theft and embezzlement against Beck before the Committee and told the jury that it was under a duty to determine whether these charges were refuted by an explanation attributed by the press to Beck:

> "It seems unnecessary to review the recent testimony before a Senate Investigating Committee except to say that disclosures have been made indicating that officers of the Teamsters Union have, through trick and device, embezzled or stolen hundreds of thousands of dollars of the funds of that union—money which had come to the union from the dues of its members. . . .
>
> "The president of the Teamsters Union has publicly declared that the money he received from the union was a loan which he has repaid. This presents a question of fact, the truth of which is for you to ascertain."

---

[9] Although 52 prospective jurors were admitted to *voir dire,* nine of these were excused for personal reasons of health or convenience and were not therefore questioned by either counsel.

Together with the additional facts set out by MR. JUSTICE DOUGLAS in his dissent, what I have said above seems clearly to show that the presiding judge took none of the steps, either in interrogation or in instruction, that in the atmosphere of the day would have fulfilled his state statutory duty to insure a grand jury unbiased against Beck.

This failure of the judge denies petitioner a protection which Washington has provided to similarly situated defendants over the years and which, so far as now foreseeable, Washington will continue to provide to all Washington defendants in the future. This failure would be cast in a different light if the Washington Legislature had repealed its law or if its Supreme Court had altered its interpretation and set out a general rule abrogating the right to have judges take affirmative action to insure an unbiased grand jury. But without any change in the prior law or any sure indication that Beck's "law" is the law of the future, the State of Washington in convicting Beck applies special and unfair treatment to him. For only Beck, a single individual out of all the people charged with crime by indictment in Washington, is denied his clearly defined right under the law to have the state judicial system insure his indictment by "impartial grand jurors." Through the device of an equally divided vote in the Washington Supreme Court he goes to prison for 15 years. I think that the Equal Protection Clause of the Fourteenth Amendment forbids such an invidious picking out of one individual to bear legal burdens that are not imposed upon others similarly situated.[10] I cannot agree with the Court that such a gross discrimination against a single individual with such disastrous conse-

---

[10] See *Atchison, Topeka & Santa Fe R. Co.* v. *Matthews,* 174 U. S. 96, 104–105. Cf. *McFarland* v. *American Sugar Refining Co.,* 241 U. S. 79, 86.

quences can be treated as a mere trial error. For a judicial decision which sends a man to prison by refusing to apply settled law which always has been and so far as appears will continue to be applied to all other defendants similarly situated is far more than a mere misapplication of state law.[11] It is a denial of equal protection of the law and a State should no more be allowed to deny a defendant protection of its laws through its judicial branch than through its legislative or executive branch.

I think that petitioner was denied equal protection of the law for still another reason. The four Washington judges who voted to affirm the conviction below, and whose views have therefore determined the outcome of Beck's case, agreed that those "in custody or held [on bail] to answer for an offense," the "[p]ersons for whose benefit that statute was enacted," are entitled to grand jurors without bias or prejudice.[12] This divides all persons suspected of larceny by embezzlement, as petitioner was, into two classes: (1) those persons in custody or on bail, and (2) those persons who are only under investigation by grand jury. The first class is entitled to have an impartial and unbiased grand jury; the second is not. The four judges who wanted to reverse this conviction could see no reason, nor can I, for saying that one charged with crime and in jail or on bail should be entitled to an unprejudiced grand jury but one who happened not to be already held for grand jury action could validly be indicted by a biased and prejudiced grand jury. So far as

---

[11] Unlike this case, which involves the contention that the failure of the Washington courts to apply their prior settled law as to a single statute denies petitioner Beck the equal protection of the law, *Milwaukee Elec. R. Co.* v. *Milwaukee,* 252 U. S. 100, involves the question of whether the Wisconsin Supreme Court was inconsistent in its treatment of two different municipal legislative provisions.

[12] 56 Wash. 2d, at 480, 349 P. 2d, at 390.

the need to be free from prosecution by a prejudiced grand jury is concerned, there can be no rational distinction between the need of the man who is not yet in custody and the need of the man who is in jail or on bail,[13] particularly where as here the grand jury was called for the specific purpose of examining into petitioner's activities and was so instructed. No doubt the clearest evidence of the lack of rationality in such a distinction is the fact that for 108 years the State of Washington has itself made no such distinction. For even though the statute on its face applies only to those in custody or on bail, it has always been interpreted to guarantee an impartial grand jury to all.

A fair trial under fair procedure is a basic element in our Government. Zealous partisans filled with bias and

---

[13] Even before the adoption of the Equal Protection Clause of the Fourteenth Amendment, other courts had refused to allow any distinction as to the right to a proper composition of a grand jury under state law between those in jail or on bail and those merely subject to grand jury investigation. Thus in *United States* v. *Blodgett,* 30 Fed. Cas. 1157, 1159 (No. 18312), the court said:

"True, he was not arrested and imprisoned on any criminal charge, and now brought hither by order of the court, nor is he under bail or recognizance; but because he is not in any of these constrained positions, is he any the less entitled to a grand jury of his country, legally qualified under its laws? Surely not."

And in *McQuillen* v. *State,* 16 Miss. 587, 597, the Mississippi court said as to a purported distinction between the right of persons in court at the time of indictment to challenge grand jurors for cause and the right of those not in court to challenge such jurors:

"[T]he law works unequally by allowing one class of persons to object to the competency of the grand jury, whilst another class has no such privilege. This cannot be. The law furnishes the same security to all, and the same principle which gives to a prisoner in court the right to challenge, gives to one who is not in court the right to accomplish the same end by plea . . . ." See also *Hardin* v. *State,* 22 Ind. 347, 351–352; *Crowley* v. *United States,* 194 U. S. 461, 469–470.

prejudice have no place among those whom government selects to play important parts in trials designed to lead to fair determinations of guilt or innocence. Whether the due process provisions of the Federal Constitution require, however, that every procedural step in a trial, including the impaneling of a grand jury, be absolutely fair and impartial, I need not determine here. But in considering whether people charged with the same crimes under the same circumstances, subject to the same penalties in the same place may be divided up into classes, some of whom are given the benefit of fair grand jurors and some of whom are not, we must keep in mind the high standard of fair and equal treatment imposed by the Equal Protection Clause of the Fourteenth Amendment, as well as the important part that grand juries play in trial procedures when they are used. For me the need for fair grand juries as between those who have not yet been formally arrested and those who have is too much the same to be treated as though it were different. I would not permit the State of Washington to lay its hands so unequally upon groups whose interests, whose needs and whose dangers are so similar.[14]

Not surprisingly the Court attempts to shrug off both of Beck's equal protection claims without reaching them on the merits. As to his first claim, that he was denied equal protection by the failure of the Washington courts to accord him the benefit of the state law guaranteeing an impartial grand jury, this Court asserts that even if Beck was, unlike everyone else, denied the benefit of a grand jury which had been questioned by the presiding judge to protect against bias, the error was harmless because he presented no proof to show that the grand jury selected in violation of Washington law was actually

---

[14] Cf. *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535.

biased or prejudiced against him.  But the Washington law puts the duty on the judge to insure against bias not on the defendant to show bias.  The court cites absolutely no authority and I have been unable to find any that when a Washington State judge neglects his duty to assure an impartial grand jury his error is cured by the failure of the defendant to show actual bias on the part of one or more grand jurors.   On the contrary, the Washington Supreme Court said in *State ex rel. Murphy* v. *Superior Court:*

> "Granting, for the sake of argument, that no real injustice has been done in this particular case, and that a fair jury was selected, to approve the method adopted by the court would be to permit a judge, if he so willed, to provide a grand jury of his own choosing in every case under color of law." [15]

Moreover, even if it were possible under Washington law so cavalierly to fritter away important rights of criminal procedure designed to achieve fairness, this record should satisfy the most doubting Thomas that the failure to insure a proper grand jury here was in fact not harmless. While the trial court made no determination as to whether the grand jury was prejudiced against Beck, four of the eight Washington Supreme Court judges who ruled on the question felt that a conclusive showing of prejudice had been made.   Judge Donworth, speaking for those four judges, after an exhaustive review of the facts concluded:

> "I think it would be unrealistic to believe that a very substantial number of the citizens of the community had not adopted, consciously or unconsciously, an attitude of bias and prejudice toward appellant at the time the grand jury was convened.   If ever there

---

[15] 82 Wash. 284, 287–288, 144 P. 32, 33.

was a case which required the most stringent observance of every safeguard known to the law to protect a citizen against bias and prejudice, this was it." [16]

The other four judges did say: "There is no showing of bias or prejudice," but gave not the slightest evidentiary or even argumentative support to show the correctness of this offhand statement. [17] In these circumstances where there has been no finding by the trial court and where the highest court of the State has divided evenly so that there is no finding there either, our ordinary "solemn duty to make independent inquiry and determination of the disputed facts" [18] upon which the question of denial of equal protection of the law turns becomes particularly pointed. Considering the overwhelming evidence to support the four judges who thought that petitioner had made a showing of prejudice, it seems inconceivable to me that it can fairly be said that no showing of prejudice was made.

As to Beck's second claim, that it is a denial of equal protection of the law to afford those in jail or on bail the judicial assurance of an impartial grand jury while denying such protection to those not in jail or on bail like Beck, the Court apparently does not claim that the error was harmless but discovers yet another way to avoid having to pass on the plain merits of his constitutional claim. It concludes on a number of grounds that petitioner's claim was not properly presented to the Washington Supreme Court. I do not think any one of the Court's grounds or all of them together justify its avoidance of determining Beck's constitutional contention on its merits.

(a) It is said that this contention was not properly before the State Supreme Court because "Petitioner's

---

[16] 56 Wash. 2d, at 512, 349 P. 2d, at 408.

[17] 56 Wash. 2d, at 480, 349 P. 2d, at 390.

[18] *Pierre* v. *Louisiana,* 306 U. S. 354, 358.

formal attack at the trial court level did not even mention § 10.28.030 . . . ." But Beck did claim that that section had not been complied with both in his "Challenge to Grand Jury" and in his separate motion to set aside the indictment, both of which are set out in note 3 of the Court's opinion. In fact his challenge to the grand jury was specifically cast in the terms of § 10.28.030. And Beck's reliance on § 10.28.030 and related sections of Washington's grand jury statute was emphasized time and time again by his counsel's arguments to the trial court, both oral and written, on the challenge and on his separate motion to dismiss the indictment. For example, trial counsel said:

> ". . . [T]he decisions which we have been able to find all indicate the same thing. That is, that the Grand Jury just like the trial jury, must be unbiased and unprejudiced, and indeed in a couple of the decisions they referred to this 10.28.030 in the same manner I have done to indicate the intent of the Legislature." [19]

(b) The Court says: "That the prosecution and the court viewed petitioner as outside the scope of § 10.28.030 was brought home to him in the course of the trial court proceedings on his grand jury attack." I cannot agree that the trial court construed § 10.28.030 as denying Beck the right to an impartial and unprejudiced grand jury or informed him to that effect. While it is true that the State's counsel argued and the trial court agreed that petitioner could not question the method of impaneling the grand jury by a "Challenge to Grand Jury," the trial court never even intimated that § 10.28.030 limited its assurance of an impartial and unprejudiced grand jury

---

[19] The decisions referred to were *Watts* v. *Washington Territory*, 1 Wash. Terr. 409; *State ex rel. Murphy* v. *Superior Court*, 82 Wash. 284, 144 P. 32; and *State* v. *Guthrie*, 185 Wash. 464, 56 P. 2d 160.

only to those who were indicted while they were in jail or out on bond. On the contrary, the trial court admitted, even though it ultimately denied petitioner's motion without further comment, that petitioner could attack the grand jury—"incidentally on a motion to set aside the indictment"—precisely the kind of motion the petitioner actually made under § 10.40.070, which motion is set out in note 3 of the Court's opinion.

(c) The Court says that the State Supreme Court was not required to pass on petitioner's claim of denial of equal protection because it was not "definitely pointed out in the 'assignments of error' in appellant's brief," as required by Rule 43 of the State Rules on Appeal. But as just pointed out the trial court had not construed the statute as denying Beck who was not in custody or on bail the benefit of an impartial grand jury while insuring such a grand jury for defendants who were in custody or on bail. Since the trial court had made no such ruling, Beck could not of course assign as error a ruling that had not been made. He did, however, properly assign errors which, as shown in the Court's note 4, were sufficiently broad to challenge the trial court's failure to comply with state law in insuring an impartial grand jury. That was all that he could do at that time.

(d) Another ground for this Court's refusal to rule on Beck's claim is that: "The Washington Supreme Court has unfailingly refused to consider constitutional attacks upon statutes not made in the trial court . . . ." But even a casual investigation of the opinions of that court shows that it has not "unfailingly" followed any such practice.[20] Moreover, no Washington case or any other

---

[20] See, e. g., Washington v. Griffith, 52 Wash. 2d 721, 328 P. 2d 897; Lee v. Seattle-First National Bank, 49 Wash. 2d 254, 299 P. 2d 1066.

has been cited to prove that a question of equal protection of the law must be raised in the trial court even though that court does not itself ever make a ruling which denies equal protection of the law. And I would think that this Court would not tolerate use of such a state device to bar correction of constitutional violations.

(e) Finally while I disagree that Beck's claim has not been properly presented to the Washington Supreme Court, I find that wholly immaterial here. For as we said in *Raley* v. *Ohio:* "There can be no question as to the proper presentation of a federal claim when the highest state court passes on it." [21] And here although undoubtedly familiar with the state rule and the state cases dug up here by this Court for the first time to show that Beck's claim was not properly presented, the fact is that the eight judges of the Washington Supreme Court who sat in this case did actually pass on Beck's claim in his brief before them that to take away his right to an impartial grand jury because he was not in custody or on bail would deny him the equal protection of the laws. That claim in Beck's State Supreme Court brief was:

> "In fact, to permit one who has already been arrested to challenge the mental qualifications of a grand juror, while denying this right to one who has not been arrested, would amount to a denial of equal protection of the law. This is particularly true . . . in the state of Washington . . . ." [22]

---

[21] 360 U. S. 423, 436.

[22] I know of no reason why this Court should say that the Washington Supreme Court would not "search through the brief" "to find" this contention, for I am not willing to assume that the members of the highest court of Washington did not read the briefs of the parties in this case. I must also take issue with the Court's view that this particular constitutional contention was stated in only one sentence. As I read the briefs before me petitioner took up almost two whole

In response to Beck's claim Judge Donworth, speaking for the four judges who voted to reverse the conviction, fully agreed with his contention, saying:

"I do not understand how it can be said, under the facts shown in this record, that the *reason* entitling a person in custody or held to answer for an offense to be investigated by an impartial and unprejudiced grand jury, does not apply equally well to appellant. It is axiomatic that all men are equal before the law and are entitled to the same rights *under the same or similar circumstances.*

.        .        .        .        .

"Until the legislature amends or repeals the statutory law, . . . it must be applied with equal effect to every person whose conduct is under investigation by a grand jury pursuant to the court's charge to it." [23]

---

pages in presenting this argument and cites eight cases and other authorities. Moreover, the four State Supreme Court judges who voted to affirm and who had petitioner's brief before them referred to that part of the brief devoted to the "Grand Jury Proceedings" as "the longest section of appellant's brief." 56 Wash. 2d, at 475, 349 P. 2d, at 387. Since they had to read this section to refer to it in this way and to discuss it, I am at a complete loss to understand the Court's further statement that petitioner's argument on this point was "considered by the Washington Supreme Court to be an abandonment or waiver of such contention." I can only consider the abandonment found by this Court to be an *ex post facto* abandonment as far as the Washington Supreme Court is concerned because as pointed out above that court actually considered and passed on the point.

[23] 56 Wash. 2d, at 528, 530, 349 P. 2d, at 418, 419. (Emphasis supplied by Judge Donworth.) To suggest, as the Court does, that this discussion involves *"interpretation"* of the statute but does not relate to equal protection of the laws is to draw a distinction that simply does not exist. What the four judges who wanted to reverse this conviction said in the plainest words possible was that the interpretation of the statute adopted by the four who voted to affirm is one that is wrong because, among other reasons, it denies equal protection of the law.

The other four judges, obviously disagreeing with their brethren and rejecting Beck's equal protection claim, held that "There was a reason" for the statutory guarantee of an impartial grand jury for one "in custody or held to answer for an offense," although denying it to one not in custody or on bail.[24]

(f) The Court also goes so far as to say that Beck's constitutional question was not included among those questions presented which our writ of certiorari was granted to review. I disagree. In the questions presented in the petition for certiorari and in the brief supporting that petition, counsel for Beck repeatedly asserted that in the manner of selecting this grand jury Beck had been denied the equal protection of the law. The core of all these claims is discrimination growing out of the manner of the selection of the grand jury. The particular classification claim which the Court seeks to avoid passing on is also a claimed discrimination with reference to the manner of selection of the grand jury. Since all these contentions are inextricably intertwined, under our decision of last term in *Boynton* v. *Virginia*[25] I see no more reason for refusing to pass on one than another. That case held a statutory claim of discrimination to have been sufficiently raised where discrimination generally was "the core of the . . . broad constitutional questions presented." Moreover, I agree with MR. JUSTICE DOUGLAS that under Rule 23 which prohibits "unnecessary detail" and which deems a question presented "to include every subsidiary question fairly comprised therein" even the most general claim of equal protection would have been sufficient to raise petitioner's claim.

The petitioner here, however, has no need to rely on either the *Boynton* case or on the broad mandate of Rule 23, for his claims are clearly encompassed among the

---

[24] 56 Wash. 2d, at 479, 349 P. 2d, at 390.

[25] 364 U. S. 454, 457.

specific questions as to which the writ of certiorari was granted. Two of those questions read in part:

". . . [D]oes a person . . . have a right under the due process and equal protection clauses of the Fourteenth Amendment to have the charges and evidence considered by a grand jury which was fair and impartial or, at least, which was instructed and directed to act fairly and impartially?"

". . . [D]id he [petitioner] have a right under the due process and equal protection clauses of the Fourteenth Amendment to have the grand jury impaneled in a manner which would prevent or at least tend to prevent the selection of biased and prejudiced grand jurors?"

Since petitioner's claim is that he was denied equal protection of the law by the failure of the presiding judge to provide the protection, guaranteed to others, of a grand jury impaneled in a manner that would insure against biased and prejudiced grand jurors, it seems inconceivable that this conviction should be sustained on the basis that the claim was not included in the petition for certiorari.

The net result of what has taken place in the Washington Supreme Court and here is to leave Beck in this predicament: the State Supreme Court considered his contention, tried to decide it but could not because it was equally divided; this Court on the contrary refuses to decide it at all on the ground that Beck has never raised such a question anywhere. The practical consequence of this predicament is to accept the argument of the State that if Beck's constitutional rights are to be protected he must depend upon "the Washington legislature and not the United States Supreme Court." [26] For this Court to

---

[26] That argument was fully set out in the State's Opposition to the Petition for certiorari: "The effect of the Washington court decision in the instant case is that the meaning of Washington statutes in

accept such a consequence seems to me to be an abandonment of its solemn responsibility to protect the constitutional rights of the people.

The rules of practice which Congress and this Court have adopted over the course of years to crystallize and define the issues properly before the Court were designed to assist the Court in the fair and impartial administration of justice. I cannot believe that this end has been achieved here.

MR. JUSTICE DOUGLAS, dissenting.

I.

Although, according to *Hurtado* v. *California,* 110 U. S. 516, Washington need not use the grand jury in order to bring criminal charges against persons, it occasionally does use one; and a grand jury was impaneled in this case. It is well settled that when either the Federal Government or a State uses a grand jury, the accused is entitled to those procedures which will insure, so far as possible, that the grand jury selected is fair and impartial.[1] That

---

regard to grand juries cannot be determined at this point. It would follow that this determination also is binding on the United States Supreme Court.

"Since there is neither a Federal nor a Washington state Constitutional right to an impartial grand jury, and the Washington Supreme Court cannot determine what the Washington statutes prescribe in that regard, *the Washington legislature and not the United States Supreme Court* must answer that question." (Emphasis supplied.)

[1] Since petitioner was not represented by counsel at the impaneling of the grand jury, his objection at the return of the indictment was timely. As stated in *Crowley* v. *United States,* 194 U. S. 461, 469–470:

"Some of the cases have gone so far as to hold that an objection to the personal qualifications of grand jurors is not available for the accused unless made before the indictment is returned in court. Such a rule would, in many cases, operate to deny altogether the right of an accused to question the qualifications of those who found

is the reason why the systematic exclusion of Negroes from grand jury service infects the accusatory process. See *Pierre* v. *Louisiana*, 306 U. S. 354; *Cassell* v. *Texas*, 339 U. S. 282. The same principle was applied in *Hernandez* v. *Texas*, 347 U. S. 475, when Mexicans were systematically excluded from duty as grand and petit jurors. The same principle would also apply "if a law should be passed excluding all naturalized Celtic Irishmen" from grand jury duty. *Strauder* v. *West Virginia*, 100 U. S. 303, 308.

Racial discrimination is only one aspect of the grand jury problem. As stated in *Hale* v. *Henkel*, 201 U. S. 43, 59, ". . . the most valuable function of the grand jury was not only to examine into the commission of crimes, but to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will." We emphasized in *Hoffman* v. *United States*, 341 U. S. 479, 485, the importance of "the continuing necessity that prosecutors and courts alike be 'alert to repress' any abuses of the investigatory power" of the grand jury.[2] We recently stated in *Costello* v. *United States*, 350 U. S. 359, 362, that:

> "The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide *a fair method* for instituting criminal proceedings against persons believed to have committed crimes." (Italics added.)

---

the indictment against him; for he may not know, indeed, is not entitled, of right, to know, that his acts are the subject of examination by the grand jury."

[2] See Morse, A Survey of the Grand Jury System, 10 Ore. L. Rev. 217.

The Washington Supreme Court, which affirmed this judgment of conviction, did so by an equally divided vote. The four voting for affirmance stated that absent a statutory requirement, "bias or prejudice" on the part of the grand jury was irrelevant. 56 Wash. 2d 474, 480, 349 P. 2d 387, 390.

The case of *Frisbie* v. *Collins,* 342 U. S. 519, is offered as justification for the use of an unfair procedure in bringing this charge against petitioner. We there held that forcibly abducting a person and bringing him into the State did not vitiate a state conviction where the trial was fair and pursuant to constitutional procedural requirements. Here, however, a part of the criminal proceeding is itself infected with unfairness. Whether it was necessary to use the grand jury is immaterial. It was used; and the question is whether it was used unfairly. The case is, therefore, like those where procedures, anterior to the trial, are oppressive. A notorious example is an unlawful arrest or the use of detention by the police to obtain a confession. See, *e. g., Payne* v. *Arkansas,* 356 U. S. 560; *Fikes* v. *Alabama,* 352 U. S. 191; *Watts* v. *Indiana,* 338 U. S. 49; *Turner* v. *Pennsylvania,* 338 U. S. 62; *Ward* v. *Texas,* 316 U. S. 547. Another example is denial of the right to counsel. As stated in *Powell* v. *Alabama,* 287 U. S. 45, 57, that right extends to a period anterior to the trial itself "when consultation, thorough-going investigation and preparation" are "vitally important." Cf. *Spano* v. *New York,* 360 U. S. 315, 324 (concurring opinion).

Could we possibly sustain a conviction obtained in either a state or federal court where the grand jury that brought the charge was composed of the accused's political enemies? If we did, we would sanction prosecution for private, not public, purposes. Whenever unfairness can be shown to infect any part of a criminal proceeding, we should hold that the requirements of due process are lacking.

A dissent in *Cassell* v. *Texas,* 339 U. S. 282, 298, said, "It hardly lies in the mouth of a defendant whom a fairly chosen trial jury has found guilty beyond reasonable doubt, to say that his indictment is attributable to prejudice." *Id.,* at 302. But the Court did not agree. Since a grand jury was used to indict, the Court held the grand jury to constitutional requirements. We should do the same here. As we stated in *Hill* v. *Texas,* 316 U. S. 400, 406:

> "It is the State's function, not ours, to assess the evidence against a defendant. But it is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained."

A grand jury serves a high function. As stated in *United States* v. *Wells,* 163 F. 313, 324:

> "It is a familiar historical fact that the system was devised to prevent harassments growing out of malicious, unfounded, or vexatious accusations. That it serves the purpose of allowing prosecutions to be initiated by the people themselves in no way detracts from the fact that it still stands as a safeguard against arbitrary or oppressive action."

The same view was stated by Mr. Justice Field, sitting as Circuit Justice:

> "In this country, from the popular character of our institutions, there has seldom been any contest between the government and the citizen, which required the existence of the grand jury as a protection against oppressive action of the government.

Yet the institution was adopted in this country, and is continued from considerations similar to those which give to it its chief value in England, and is designed as a means, not only of bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting the citizen against unfounded accusation, whether it come from government or be prompted by partisan passion or private enmity." 30 Fed. Cas. 992, 993, No. 18,255.

One who reads this record is left with doubts of the most serious character that the procedure used in the selection of the grand jury was fair in light of the unusual conditions that obtained at the time.

## II.

Petitioner on March 26 and 27, 1957, appeared before a Senate Committee in Washington, D. C., and during his questioning invoked the Fifth Amendment 150 times.

On May 2, 1957, petitioner was indicted in Tacoma by a federal grand jury for income tax evasion.

On May 8, 1957, petitioner was recalled to testify before the Senate Committee and during another long interrogation invoked the Fifth Amendment about 60 times.

During these hearings the Committee members made various comments concerning petitioner. As Judge Donworth, speaking for himself and three other members of the Supreme Court of Washington, said:

"These comments, which were extremely derogatory to appellant, were widely circulated by all news media throughout the United States, and particularly in the Seattle area. In these comments, appellant was characterized as a thief, and it was asserted that he was guilty of fraud and other illegal conduct with respect to his management of the affairs of the teamsters' union as its principal officer in the eleven

western states, and later in his position as its international president.

"These conclusions and opinions (particularly those expressed by Senator McClellan, the chairman of the committee) were displayed by local newspapers on the front page in prominent headlines. The following are a few of the comments which were referred to in such headlines which appeared in Seattle newspapers:

" 'TEAMSTERS' CASH KEPT GOING TO BECK AFTER HE BECAME UNION PRESIDENT, SAYS PROBER.' Seattle Times, March 23, 1957.

.    .  .          .          .

" 'BECK GIVES "BLACK EYE" TO LABOR, SAYS SEN. McNAMARA.' Seattle Times, March 27, 1957.

" 'SENATE PROBE LIFTS LID ON BECK BEER BUSINESS—USE OF UNION MONEY RELATED.' Seattle Post-Intelligencer, May 9, 1957.

"Substantial portions of the committee proceedings relating to these charges were also reproduced in the course of news broadcasts on local radio and television stations.

"The amount, intensity, and derogatory nature of the publicity received by appellant during this period is without precedent in the state of Washington. A Seattle newspaper carried a news item reporting that the switchboard of a local radio station that had broadcast the committee proceedings on the preceding day was jammed with calls, and that the officials of the station characterized the response to the broadcast on the part of the public as 'astounding,' and that such response was greater than that resulting from any other broadcast ever aired by them. The serious accusations made by United States senators in the committee hearings are generally regarded by

laymen as being officials charges (which appellant had refused to answer), and thus the impression was created among the general public that appellant had been found guilty of a crime." 56 Wash. 2d 474, 510–512, 349 P. 2d 387, 408.

The grand jury which returned the indictment was convened on May 20, 1957.

The effect of the saturation of Seattle with this adverse publicity was summarized by Judge Donworth:

"The natural effect of this publicity was that, in the eyes of the average citizen, the character of appellant had been thoroughly discredited in the Seattle area on or before May 20, 1957." 56 Wash. 2d, at 512, 349 P. 2d, at 408.

The *trial court* at the time of the selection of the *petit jury* referred to the publicity the case had received in the papers and over the radio and TV and sought to determine whether any jurors had become prejudiced or biased against the accused. The judge who impaneled the *grand jury* took no such precautions. He excused three who might have been prejudiced because they were or had been members of petitioner's union or of affiliated unions. He excused one employer who in reply to the question "Are you conscious of any bias, prejudice or sympathy in this case at all?" said, "That is pretty hard to answer." Of the six he excused, two admitted prejudice. Not once did the judge inquire as to the intensive adverse publicity petitioner had received and its likely effect on each juror. He asked two types of questions. The one already noted, whether the juror was conscious of bias, etc., and the other one, "Is there anything about sitting on this grand jury that might embarrass you at all?" It seems to me that the judge was derelict in failing to ascertain whether the amount of adverse

publicity petitioner had received had prejudiced the jurors toward the case about to be presented. Although he made no such inquiry of any juror, he proceeded upon the assumption that the grand jury had full knowledge of the activities of the Senate Committee:

"We come now to the purpose of this grand jury and the reasons which the judges of this court thought sufficient to justify the expense to the county, and the inconvenience to and sacrifice by you, which this grand jury session will require.

"It seems unnecessary to review the recent testimony before a Senate Investigating Committee except to say that disclosures have been made indicating that officers of the Teamsters Union have, through trick and device, embezzled or stolen hundreds of thousands of dollars of the funds of that union—money which had come to the union from the dues of its members. It has been alleged that many of these transactions, through which the money was siphoned out of the union treasury, occurred in King County. Such crimes, if committed, cannot be punished under Federal law, or under any law other than that of the State of Washington, and prosecution must take place in King County. The necessary criminal charges can only be brought in this county upon indictment by the grand jury or information filed by the prosecuting attorney.

"The president of the Teamsters Union has publicly declared that the money he received from the union was a loan which he has repaid. This presents a question of fact, the truth of which is for you to ascertain.

"You may find that many of the transactions happened more than three years ago; this would raise the question of the statute of limitations, which ordi-

narily bars a prosecution for larceny after three years. There are some instances, however, where the period is extended. This is a question of law and you should be guided by the advice of the prosecutors on this and similar questions. Your investigation may conceivably result in the adoption of better standards of conduct for union officials."

No admonition was given that radio, television, and newspaper reports were not the gospel. No warning was made that one who invokes the Fifth Amendment does not admit guilt. No admonition was given that the deliberations should be free of bias or prejudice. The question is not whether one who receives large-scale adverse publicity can escape grand jury investigation nor whether the hue and cry attendant on adverse publicity must have died down before the grand jury can make its investigation. This case shows the need to make as sure as is humanly possible that one after whom the mob and public passion are in full pursuit is treated fairly, that the grand jury stands between him and an aroused public, that the judge uses the necessary procedures to insure dispassionate consideration of the charge.

The State of Washington uses the grand jury only occasionally, the normal method of accusation being by information. Whether grand jurors in other cases are screened for bias or prejudice does not appear. Yet on the assumption that they are not, Beck's objections should not be in vain. Whether the unfair device is used customarily or only once, it does not comport with the Due Process Clause of the Fourteenth Amendment.

### III.

I think the Court is correct in rejecting the general equal protection question on the merits. But I do think that a narrow phase of equal protection was raised and

should be decided in petitioner's favor.[3] It is conceded that if Beck had been "in custody or held to answer for an offense" he would have been entitled to challenge the grand jurors for prejudice. 56 Wash. 2d, at 479, 349 P.

[3] This is not a case where decision is asked on a question not "formally presented" by the petition for certiorari, as was true in *General Pictures Co.* v. *Electric Co.*, 304 U. S. 175, 179. It appears from the record that the question of equal protection was a "definite issue" decided by the Washington Supreme Court (*Seaboard Air Line R. Co.* v. *Duvall*, 225 U. S. 477, 487); and in at least two places in the questions presented by the petition for certiorari that decision was challenged for denial of equal protection. This was clearly sufficient, as Rule 23 (1)(c), *in haec verba*, discourages detailed amplification of the questions presented:

"The questions presented for review, expressed in the terms and circumstances of the case but without unnecessary detail. The statement of a question presented will be deemed to include every subsidiary question fairly comprised therein. . . ."

The petition states, *inter alia:*

"1. Where accusation is by a grand jury indictment, does a person (in this case a member and officer of a labor union who at the time of the grand jury proceedings was the subject of continuous, extensive and intensely prejudicial publicity) have a right under the due process and equal protection clauses of the Fourteenth Amendment to have the charges and evidence considered by a grand jury which was fair and impartial or, at least, which was instructed and directed to act fairly and impartially?

"(a) Where petitioner was a member and officer of a labor union, and where prejudicial and inflammatory charges against him were being widely and intensively disseminated by all news media, did he have a right under the due process and equal protection clauses of the Fourteenth Amendment to have the grand jury impaneled in a manner which would prevent or at least tend to prevent the selection of biased and prejudiced grand jurors?"

This is enough to bring the case within our rule that only the questions "urged in the petition for certiorari and incidental to their determination will be considered on review." *Rorick* v. *Devon Syndicate*, 307 U. S. 299, 303.

At least four of the judges below thought that the equal protection point treated in this dissent was an issue. For after referring to the Washington statute which gives those in custody or held to answer

2d, at 390.   To grant that class the right to challenge for prejudice and to deny it to those who are merely under investigation is to draw a line not warranted by the requirements of equal protection.   I agree with the views of Judge Donworth, with whom Judges Finley, Hunter, and Rosellini concurred:

> "I do not understand how it can be said, under the facts shown in this record, that the *reason* entitling a person in custody or held to answer for an offense to be investigated by an impartial and unprejudiced grand jury, does not apply equally well to appellant. It is axiomatic that all men are equal before the law and are entitled to the same rights *under the same or similar circumstances.*"   56 Wash. 2d, at 528, 349 P. 2d, at 418.

---

for an offense the right to an impartial and unprejudiced grand jury (56 Wash. 2d, at 527–528, 349 P. 2d, at 417) they stated: "Until the legislature amends or repeals the statutory law, quoted and emphasized above, it must be applied with equal effect to every person whose conduct is under investigation by a grand jury pursuant to the court's charge to it."   56 Wash. 2d, at 530, 349 P. 2d, at 419.   That seems to me sufficient to bring this ruling within the statement in *Raley* v. *Ohio,* 360 U. S. 423, 436, to the effect that "There can be no question as to the proper presentation of a federal claim when the highest state court passes on it."